EUGENE STAUBER AND SILVIA STAUBER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stauber v. Commissioner
Docket No. 5079-87
United States Tax Court
T.C. Memo 1992-128; 1992 Tax Ct. Memo LEXIS 147; 63 T.C.M. (CCH) 2258; T.C.M. (RIA) 92128; March 3, 1992, Filed *147 Decision will be entered under Rule 155. Stuart A. Smith and Richard B. Stone, for petitioners. Vincent J. Guiliano and Raymond A. Kahn, for respondent. WELLS
WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined the following deficiency in petitioners' Federal income tax for 1982:  Additions to Tax
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
$ 28,278
$ 1,414
50% of the
$ 2,828
interest due
on the
deficiency
Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. In his answer, respondent asserts an increased deficiency and the addition to tax under section 6661 in the amount of $ 7,069.50. The instant case involves the allowability of a loss arising out of the investment by petitioner Eugene Stauber (Mr. Stauber) as a general partner in Mex Research Associates (the Partnership). After concessions, the issues for our consideration are: (1) Whether certain research and development expenditures of the Partnership were made in connection with a trade or *148 business; (2) whether Mr. Stauber was at risk with respect to certain expenditures of the Partnership; (3) whether the Partnership was engaged in an activity for profit; (4) whether certain miscellaneous deductions of the Partnership were properly deductible; (5) whether petitioners are liable for additions to tax for negligence; and (6) whether petitioners are liable for an addition to tax for substantial understatement of their income tax. FINDINGS OF FACT Some of the facts and certain documents were stipulated for trial pursuant to Rule 91. The parties' stipulations are incorporated in this Opinion irrespective of any restatement below. At the time they filed their petition, petitioners resided in Tel Aviv, Israel. They filed a joint individual Federal income tax return for 1982. Mr. Stauber owns a company which manufactures and imports chains and is a successful businessman. After completing high school, he attended trade school. Mr. Stauber and his company engaged a certified public accountant, Leon Reimer, who Mr. Stauber has known since 1978. Mr. Stauber became a general partner in the Partnership based on the recommendation of Mr. Reimer. Mr. Herbert Platt has *149 a doctorate in physical chemistry and the biological sciences. After receiving his doctorate, he worked for a major pharmaceutical company for 2 years. Dr. Platt then started his own medical reference laboratory business. His laboratory eventually performed assays and made test determinations for hospitals throughout the Eastern seaboard. Dr. Platt subsequently sold his reference laboratory business for a sum of $ 750,000 to $ 800,000. After selling his laboratory business, he worked as a consultant and later became involved with New York University School of Medicine. He assisted the medical school in starting and building an outpatient laboratory for its cooperative care center. While he was involved with New York University's medical school, Dr. Platt also taught laboratory management to pathologists and acted as the director of chemistry at Belview Hospital. During 1979, Dr. Platt decided to go back into business in the private sector. From 1979 through early 1981, his work involved raising capital to establish a biotechnology company which would engage in developing monoclonal antibodies. The basic technology for producing monoclonal antibodies was described in scientific *150 literature in 1975 and was in the public domain. Although the general process for producing monoclonal antibodies was known, the process is subject to numerous variations and improvements. Genetic Diagnostic Corp. (Genetic) was incorporated as a New York corporation in January 1981. Genetic was organized to develop, produce and market diagnostic products incorporating monoclonal antibodies created by cell fusion techniques. During June 1984, Genetic prepared a prospectus containing the following explanation of the monoclonal antibody technology it had developed: Antibodies are substances found circulating in the blood of humans and animals which are specifically formed by the body to counteract a foreign body (antigen) within the organism. The antibody tends to bind itself to the antigen and thereby neutralize the potential ill effect of the antigen. This antibody-antigen binding is highly specific -- a specific antibody will generally react only with a specific antigen. The specific nature of antibody-antigen binding has provided the basis for diagnostic tests (immunoassays) for identifying and measuring, in very small quantities, particular antigens. By "measuring" binding *151 reactions between a particular antibody and antigen in a patient specimen, an operator can detect or measure the presence or the concentration of the antigen. Antibodies have traditionally been produced by injecting a specific antigen into a livestock or laboratory animal. The appearance in the organism of the antigen causes the animal's natural immunization functions to produce antibodies in order to neutralize the effect of this foreign substance. Thereafter, the antibodies produced by the animal are extracted from the animal's blood, refined and utilized for therapeutic and diagnostic purposes. The Company produces antibodies by fusing healthy cells extracted from the spleens of mice that have been caused to produce a specific antibody (after antigen injection) with cancer cells growing in tissue culture extracted from a cancerous tumor. These fused cells, known as "hybridomas," have the characteristic of producing the antibody as a by-product of normal growth. A great deal of time may be required to determine the hybridoma which generates an antibody with the desired specific reaction to the test antigen. In general, monoclonal antibody production techniques result in a *152 more consistent and higher quality antibody than those produced by traditional techniques. The Company believes that monoclonal antibodies can be incorporated into immunoassays which will prove to be more accurate and effective than those that use polyclonal antibodies produced by traditional techniques.
Genetic was initially capitalized with approximately $ 400,000 which it received from a private offering of its shares in March 1981. Dr. Herbert Platt was Genetic's president and owned a majority of its shares. John Herz, a partner in the New York City law firm of Wolf Haldenstein Adler Freeman & Herz (Wolf Haldenstein), was also an investor in Genetic. Wolf Haldenstein served as Genetic's legal counsel. Robert Davidson, an associate at Wolf Haldenstein, performed legal work for Genetic and was its assistant secretary. Genetic commenced its operations in March 1981. The $ 400,000 initially raised for Genetic was to be used to establish the company's research laboratory and facilities and to continue the company's operations for approximately 6 months. Accordingly, Genetic hired research personnel, rented facilities, and purchased laboratory equipment. Genetic's management *153 planned to raise additional capital through a public offering of its shares. The public offering was scheduled for September 1981. Genetic received a letter of intention from an investment banking firm for a firm commitment underwriting which would net Genetic $ 1.45 million after the payment of commissions and expenses. During September 1981, market conditions became unfavorable for raising capital for small, new companies. As a result, the investment banking firm assisting Genetic requested a postponement of the public offering. Genetic's management then began to consider and explore alternative means of raising capital, but no satisfactory proposals materialized. Genetic's financial situation became more acute. Genetic had expended most of its initial capital of $ 400,000 in establishing its laboratory and conducting research. Additional funds were needed to continue Genetic's operations and its research. Since the early 1970's, in addition to owning his own accounting firm, Mr. Reimer has been involved in various partnerships. At times, he has been an investor or equity holder in such partnerships. At other times, he has been involved in their management. Mr. Reimer *154 is the managing partner of the Partnership and was instrumental in its formation. Prior to forming the Partnership, Mr. Reimer had been involved in one other research and development partnership. During 1981, Mr. Reimer became interested in monoclonal antibody technology. He read various business magazine articles which emphasized the technology's significant profit potential, and he generally discussed making an investment in monoclonal antibody technology with several of his business acquaintances. However, neither Mr. Reimer nor any of his business acquaintances with whom he discussed the subject had a science background. A business acquaintance of Mr. Reimer's had a friend who was an investment banker. Dr. Platt had discussed raising capital for Genetic with the investment banker. Subsequently, the investment banker introduced Dr. Platt to Mr. Reimer. Dr. Platt, Mr. Reimer, and Howard Wendy (a business associate of Leon Reimer's) first met one another during late November 1981. During December 1981, Dr. Platt, Mr. Reimer and Mr. Wendy negotiated extensively throughout a 2-week period. They negotiated toward their and other investors' potential acquisition of the monoclonal *155 antibody technology research work applicable to diagnostic uses in humans and animals from Genetic. The negotiations included arrangements to have Genetic, on behalf of the investors, continue its research in order to develop testing kits which could be licensed to a manufacturer and sold by third parties. Dr. Platt and Messrs. Reimer and Wendy contemplated that the investors would form two partnerships, the Partnership and a second partnership named NAPA Research Associates. They also contemplated that the Partnership would become involved with the monoclonal antibody technology applicable to test uses for humans and that NAPA Research Associates would become involved with the technology applicable to test uses for animals. They further contemplated that, although each partnership would enter into a research and development agreement with Platt Research and Development Corp. (Platt Research and Development), a newly formed corporation solely owned by Dr. Platt, the actual research and development work would be performed by Genetic. In his December 1981, negotiations with Messrs. Reimer and Wendy, Dr. Platt was assisted and represented by Genetic's attorney, Mr. Davidson of Wolf *156 Haldenstein. Mr. Reimer was in charge of the negotiations for the Partnership. Mr. Wendy was in charge of the negotiations for the second partnership NAPA Research Associates. Mr. Wendy was an attorney and was a partner in the law firm of Wendy, Adler & Lisk. During their negotiations with Dr. Platt, Messrs. Reimer and Wendy received legal assistance and were represented by Mr. Wendy's law partner, Herbert Adler. Messrs. Reimer, Wendy, and Adler had no scientific background. They neither received assistance from nor consulted with any experts in monoclonal antibody research during their negotiations with Dr. Platt. During December 1981, the Partnership was formed as a New York general partnership. Its stated purpose was to "develop and license the manufacture and sale of [its] business and other new patentable products." Under the agreement entered into by the partners of the Partnership (the Partnership Agreement), the Partnership was expected to begin its existence when all units of interest in the Partnership were sold for $ 840,000. Investors purchasing units were required to pay one-third of the purchase price for their Partnership units at closing, another one-third *157 on June 1, 1982, and the last one-third on June 1, 1983. The $ 840,000 represented the partners' total capital contribution to the Partnership. The Partnership Agreement stated that "Except as they may be obligated by law or this Agreement to do so, the Partners shall not be required to make any further capital contribution to the Partnership." Pursuant to the Partnership Agreement, Mr. Reimer was obligated to serve as managing partner. He was solely responsible for the Partnership's business and was given all necessary powers to conduct such business. He was responsible for the overall supervision of its business and was obligated to maintain its books. Mr. Reimer was required to devote such time to the Partnership's business and affairs as was necessary. The Partnership Agreement provided that Mr. Reimer had the right to receive $ 25,000 per year as a management fee for 1981, 1982, and 1983. The Partnership Agreement further provided that Any of the Partners may engage in or possess an interest in other business ventures of every nature and description, including those which may compete with the Partnership without any obligation to share any profits therefrom with *158 the Partnership or the Partners.
In an assignment agreement, dated December 17, 1981 (the Assignment Agreement), the Partnership acquired from Genetic all of Genetic's rights to certain monoclonal antibody technology research data. In exchange for such rights, the Partnership was required to pay Genetic 30 percent of all adjusted proceeds actually received by the Partnership from its exploitation of the research data. For each of the fiscal years ending June 30, 1984, June 30, 1985, June 30, 1986, and June 30, 1987, however, the right to receive such 30 percent of adjusted proceeds was conditioned on the Partnership's receiving a minimum amount of $ 210,000 for each such fiscal year from all sources. On December 17, 1981, the Partnership entered into a research and development agreement (the R & D Agreement) to employ Dr. Platt's newly formed corporation, Platt Research and Development, to develop the "Product" which the Partnership had acquired from Genetic. The term "Product" was defined in the R & D Agreement as follows: The rights referred to in the attached agreement, which have been defined as the "Product", will refer to all products and by-products developed, and *159 hereafter developed, arising out of the research and development of a nonisotopic monoclonal antibody technique and system, to be used for the diagnostic testing of the human condition and disease states in accordance with the procedures set forth in the attached Protocol.
The Protocol attached to the R & D agreement provided the following: The Monoclonal Antibody technique will be used to develop diagnostic kits that measure the levels of a variety of substances in human bodily fluids (e.g., serum, urine, saliva) including: steroid hormones (e.g. progesterone and estradiol), thyroid hormones (e.g. T-3 and TSH), antiarrhythmic (e.g. digoxin) and antiasthmatic (e.g. theophylline) drug levels, antibiotic (e.g. Gantrisin) levels and other substances that can be used in the diagnoses of the human condition and disease states.
Dr. Platt had prepared the Protocol and the general explanation of monoclonal antibody research set forth in the R & D Agreement. The R & D Agreement required Platt Research and Development to devote its best efforts to researching and developing the Partnership's "Product". Although the R & D Agreement stated that substantially all of the research *160 and development work was required to be completed by December 31, 1982, the parties to the R & D Agreement contemplated that the actual work might take much longer. In any event, the R & D Agreement called for termination of the research and development efforts on June 30, 1984. Under the R & D Agreement, the Partnership was required to pay Platt Research and Development $ 1,250,000 as follows: Amount
Form
Payment Due Date
$ 200,000
cash
12/17/81
200,000
cash
7/1/82 125,000
cash
7/1/83 100,000
part of 12/17/81
7/1/83 promissory note
for $ 425,000
bearing interest
at 10% per annum
from 12/1/81
162,500
part of 12/17/81
7/1/84 promissory note
for $ 425,000
bearing interest
at 10% per annum
from 12/1/81
162,500
part of 12/17/81
7/1/85 promissory note
for $ 425,000
bearing interest
at 10% per annum
from 12/1/81
150,000
part of 7/1/82
7/1/86 promissory note
for $ 300,000
bearing interest
at 10% per annum
150,000
part of 7/1/82
7/1/87 promissory note
for $ 300,000
bearing interest
at 10% per annum
The December 17, 1981, and July 1, 1982, promissory *161 notes issued by the Partnership were nonnegotiable. Pursuant to such notes, the Partnership was required to pay Platt Research and Development, including interest, a total of $ 860,208.30, during the years 1984 through 1987. As security for the payment obligations it owed under the R & D Agreement, the Partnership executed a collateral assignment agreement under which it was required to assign to Platt Research and Development all "Product" rights which the Partnership had acquired from Genetic. The assignment became effective only upon the Partnership's default on its obligations owed to Platt Research and Development under the R & D Agreement. In a signed declaration, dated December 17, 1981, Dr. Platt agreed that he would continue, following the termination of the R & D Agreement, to devote his best efforts to the research and development of the Partnership's "Product". Under the declaration, Dr. Platt, however, was given complete discretion regarding any additional expenditure of funds by Platt Research and Development for such research and development purposes. In a March 5, 1982, letter to Genetic's shareholders, Dr. Platt advised them of the following: THE PRIVATE *162 FUNDING ARRANGEMENT
On December 17, 1981, the Company entered into a private funding arrangement with [the Partnership and another New York general partnership]. * * * After two weeks of round-the-clock discussions among the [two partnerships], the Company's Board of Directors and legal counsel, and myself, the Company agreed to enter into a funding relationship with the [partnerships]. The Company actually agreed to two separate arrangements with two separate [partnerships], although each [partnerships] has the same General Partners. The two deals are essentially identical except that one deals with research and development data regarding diagnostic testing of human condition and disease while the other deals with research and development data regarding diagnostic testing of animal condition and disease. The amount of funding provided under each arrangement is also different. For the purpose of convenience in explanation, I will treat both arrangements as one and explain the transaction in terms of the combined aggregate dollar amounts.
ASSIGNMENT AGREEMENT
The first part of the transaction consists of an assignment by the Company to the [partnerships] of its *163 research and development data, trade secrets, patent rights, and trademark rights, regarding diagnostic testing systems for human and animal purposes pursuant to an Assignment Agreement (the "Assignment") * * * In exchange, the Company will receive directly thirty percent (30%) of all profits arising out of the sale of products developed from or other exploitation of the research data assigned to the [partnerships]. As described more fully below, the Company will receive an additional twenty percent (20%) of such profits pursuant to a proposed license agreement.
* * * RESEARCH AND DEVELOPMENT AGREEMENT
The next part of the transaction required the formation of a new corporation devoted exclusively to research activities ("Research Corp."). Pursuant to a Research and Development Agreement ("Research Agreement"), Research Corp. agreed with the [partnerships] to continue the development of the data assigned by the Company to the [partnerships]. Under the Research Agreement, Research Corp. has been and shall continue to be funded by the [partnerships] with a total of approximately $ 2.4 million as follows: $ 300,000 on December 17, 1981; $ 325,000 in July, 1982; approximately *164 $ 365,000 in July, 1983; and approximately $ 1.4 million during years 1984 through 1987. All monies received by Research Corp. will be used to continue the projects begun by the Company. All common shares of Research Corp. are owned by me because the [partnerships] required that the Research Agreement be with a corporation that is completely controlled by me. However, I will not receive any personal benefits whatsoever as a result of my ownership of Research Corp. Any income earned by Research Corp. will be turned over to the Company. * * *
PROPOSED LICENSE AGREEMENT
The [partnerships] and I have discussed a proposed License Agreement (the "License"), to be entered into when products have been developed and are ready for sale. As tentatively agreed, the parties to the License will be Herbert Platt, individually, as licensee, and the [partnerships], as licensor. It will be necessary for the [partnerships'] purposes that the License be with me individually (so that I will be personally liable for the guaranteed royalties discussed later), but again I will receive no personal benefit from this arrangement. * * * Under the proposed License, I will be entitled to receive *165 twenty percent (20%) of the profits realized from sales of any products developed through the use of the research and development data sold to the [partnerships] under the Assignment. I will assign this money to the Company. The overall result will be that the [partnerships] will receive fifty percent (50%) of such profits and the Company will receive thirty percent (30%) of such profits under the Assignment, along with the twenty percent (20%) I will assign to it, for a total of fifty percent (50%). Under the License, the [partnerships] will be entitled to receive from me, during years 1984 through 1987, guaranteed royalties that would equal $ 1.38 million in addition to its fifty percent (50%) share of the profits. The Board considered the consequences if the [partnerships] and I do not enter into the License when products have been developed. The Board and legal counsel noted that the [partnerships were] obligated to pay approximately $ 1.4 million to Research Corp. during years 1984 through 1987 under the Research Agreement and if the License was not finalized I would not be obligated to pay any guaranteed royalties to the [partnerships]. In other words, without the License, *166 the [partnerships] would be entitled to receive seventy percent (70%) of the profits (since I would never receive the twenty percent (20%) under the License that I would assign to the Company), the Company will receive thirty percent (30%) under the Assignment, and the [partnerships] would be obligated to pay approximately $ 2.4 million to Research Corp. On the other hand, if the License is finalized, the [partnerships] would receive fifty percent (50%) of the profits and the Company would receive fifty percent (50%) of the profits and the [partnerships] will be entitled to receive from me guaranteed royalties of $ 1.38 million. Accordingly, the Board and legal counsel feel that it is virtually certain that the [partnerships] and I will enter into the proposed License at the appropriate time when products have been developed, and if not, then the Company will be in a more favorable position.
In the letter, Dr. Platt noted that the funding arrangement with the two partnerships provided Genetic with the capital it needed to continue its research and development activities and its proposed projects. Dr. Platt further advised Genetic's shareholders that, assuming Genetic was *167 able to develop commercially salable products and assuming that appropriate agreements could be entered into with the partnerships, the company might be in a position of making a public offering of its shares at some time in the future. [1] Lastly, the letter stated that, if shareholders had any questions concerning the transaction with the partnerships, they should contact either Dr. Platt or Genetic's attorneys, Messrs. Herz and Davidson of Wolf Haldenstein. The Partnership and Dr. Platt entered into a license agreement, dated January 5, 1983 (the License Agreement), along the lines of the license described above in the March 5, 1982, letter from Dr. *168 Platt to Genetic's shareholders. The License Agreement named "Herbert Platt or his assigns" as the licensee. The License Agreement granted the licensee the exclusive right and license to use, manufacture, market, and sell the Partnership's "Product" throughout the world. The License Agreement required the licensee to use its best efforts to market and sell the "Product". The License Agreement provided for the Partnership to receive a minimum annual royalty of $ 210,000 on June 30 during each of the years 1984 through 1987. The License Agreement further provided for the Partnership to receive an additional royalty of 50 percent of all adjusted proceeds received by the licensee in connection with the licensee's exploitation of the "Product". The License Agreement provided that this 50 percent additional royalty was to be determined without reduction for the minimum royalty payments made to the Partnership. The License Agreement further required the licensee to pay an additional 30 percent of its adjusted proceeds to Genetic. During the years 1982 through March 1984, Genetic engaged in laboratory research work in connection with developing diagnostic testing kits for humans utilizing *169 monoclonal antibody technology. The work was carefully performed, utilizing currently available technology. Genetic's research involved the development of antibodies that would react with approximately 16 different antigens. The bulk of the research was performed in connection with Genetic's attempt to develop testing kits for three drugs, digoxin, dilantin and theophylline, and for the human luteinizing hormone. Digoxin is a drug used in treating heart disease and affects heart rate. Dilantin is an anticonvulsant drug used in the treatment of epilepsy. Theophylline is a drug used in the prevention and treatment of asthma symptoms. The luteinizing hormone is a hormone produced by the pituitary gland. Genetic developed a test kit method involving the use of a plastic dipstick onto which an antigen antibody was bonded that could react with the blood, urine, or serum solution into which the dipstick was placed. On July 26, 1982, an application for a patent listing the Partnership as assignee, was filed with the United States Patent and Trademark Office for an antigen assay method and kit utilizing a dipstick. On October 16, 1984, the patent was granted. Such testing methodology *170 could be used for a variety of different tests. Once a monoclonal antibody with the desired degree of specificity to an antigen is developed and a dipstick to which the monoclonal antibody will properly adhere for testing purposes is developed, further research and development work is still required. The reliability of the test must be confirmed through further laboratory and clinical testing. After such confirmation, the test must then be reviewed by the United States Food and Drug Administration before any diagnostic products may be sold commercially. By an assignment agreement, dated January 10, 1984 (the License Assignment), the License Agreement was assigned to Genetic. Under the License Assignment, Dr. Platt remained personally liable to pay the $ 840,000 in annual minimum royalties Genetic owed the Partnership during the years 1984 through 1987, in the event Genetic failed to pay them. Purportedly in exchange for giving its consent to the License Assignment, the Partnership received warrants from Genetic. Under the warrants, the Partnership was granted the right to purchase a total of 154,000 shares of Genetic's stock at specified prices, as low as $ 2.50 and as high *171 as $ 3.50 per share, over a 5-year period. The specified price per share depended upon the date of exercise of the right to purchase shares. During January 1984, Genetic planned to raise up to $ 1.8 million of additional capital from a public offering of its shares and warrants to purchase its shares. An investment banking firm agreed to act as underwriter and market the shares and warrants for Genetic on a best efforts basis. During June 1984, Genetic filed a registration statement with the Securities and Exchange Commission for a public offering of investment units consisting of its shares and warrants for shares. The record does not disclose how much capital, if any, was raised for Genetic in such offering. In its June 1984 registration statement for such public offering, Genetic stated that it had developed several products but had not yet commenced marketing them. It stated that, subject to filing with regulatory authorities, it planned to market its monoclonal antibody diagnostic products. It had completed development of diagnostic tests for the drugs digoxin, dilantin and theophylline, and had begun to collect some of the data required for United States Food and Drug *172 Administration approval. According to the registration statement, however, Genetic did not anticipate that it would market its products itself. Rather, Genetic's management believed that Genetic's products could be more successfully marketed if Genetic could enter into distribution arrangements with larger and better capitalized medical product distributors. Ultimately, Genetic was not successful in having its monoclonal antibody diagnostic products commercially marketed. Later, it also attempted to elicit the interest of the United States Army and diagnostic companies in researching and developing other uses of the dipstick test methodology Genetic had developed. The Army, for instance, was interested in developing fast assays that could be used in the field for antibiological warfare purposes. After commissioning Genetic to conduct two feasibility studies, the Army decided against producing testing kits based on Genetic's dipstick methodology. Genetic also was unsuccessful in having diagnostic companies license its testing methodology. As of the time of trial, Genetic was insolvent and was no longer conducting any operations. On the dates indicated below, the Partnership *173 issued the checks indicated below to Platt Research and Development: Amount
Date
$200,000
12/17/81
200,000
6/30/82 62,500
6/30/83 62,500
8/10/83 115,833
8/10/83 204,479
10/8/85 220,729
10/8/85 210,000
12/31/87
210,000
12/31/87
15,000
12/31/87
Such checks indicated that they were made pursuant to the R & D Agreement. On the dates indicated below, the Partnership received the checks indicated below for "minimum royalties" from Platt Research and Development: Amount
Date
$ 210,000
10/8/85 210,000
10/8/85 210,000
12/31/87
210,000
12/31/87
Such checks indicated that they were made pursuant to the License Agreement. The five checks totaling $ 860,208 and issued during the years 1985 through 1987 by the Partnership to Platt Research and Development and the four checks totaling $ 840,000 and issued during the years 1985 through 1987 by Platt Research and Development to the Partnership, were drawn on respective accounts maintained by the Partnership and Platt Research and Development at the same bank. The Partnership employed an accrual method of accounting. On its 1982 return, the Partnership reported an ordinary loss of $ 599,517. Such loss *174 was based on deductions claimed by the Partnership as follows: Item
Amount Amortization -- organizational costs
$ 2,000
Guaranteed payments -- management fee
25,000
Interest expense
57,500
Miscellaneous -- check printing
17
Professional fees -- legal and accounting work
15,000
Research & development expenditures
500,000
On their 1982 individual return, petitioners claimed an ordinary deduction in the amount of $ 44,963 for Mr. Stauber's distributive share of the Partnership's loss for such year. The Partnership's 1982 return and petitioners' 1982 individual return were prepared by Mr. Reimer's accounting firm, Leon Reimer & Co., P.C. Mr. Reimer signed the Partnership's 1982 return. No closing agreements were concluded with respect to the 1981 and 1982 Partnership losses taken by Mr. Stauber. In her notice of deficiency, respondent disallowed the entire $ 44,963 ordinary loss deduction claimed by petitioners as their share of the Partnership's reported loss for 1982. OPINION Trade or Business Requirement of Section 174
Section 174(a)(1) generally provides: A taxpayer may treat research or experimental expenditures which are paid or incurred by him during *175 the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction.
Section 174(a)(1) applies to expenditures paid or incurred by a taxpayer for research or experimentation undertaken directly by a taxpayer and also to expenditures paid or incurred by a taxpayer for research or experimentation carried on by another person or entity on the taxpayer's behalf. Sec. 1.174-a(a)(2), Income Tax Regs.
To be entitled to deductions for research and experimental expenditures, a taxpayer is not required to currently produce or sell any product. Moreover, a taxpayer need not be currently engaged in a trade or business in order to qualify for such deductions. Snow v. Commissioner, 416 U.S. 500, 503-504 (1974). Nevertheless, in Green v. Commissioner, 83 T.C. 667, 686-687 (1984), we stated: For section 174 to apply, the taxpayer must still be engaged in a trade or business at some time, and * * * [the Court] must still determine, through an examination of the facts of each case, whether the taxpayer's activities in connection with *176 a product are sufficiently substantial and regular to constitute a trade or business for purposes of such section. [Fn. ref. and citations omitted.]
A taxpayer must be more than a mere investor to be entitled to deductions for research and experimental expenditures under section 174. Id. at 688-689. See also Levin v. Commissioner, 87 T.C. 698, 725-726 (1986), affd. 832 F.2d 403 (7th Cir. 1987). In the case of a partnership that claims deductions under section 174, the relevant inquiry is whether the partnership has any realistic prospect of entering into a trade or business involving the technology under development. Spellman v. Commissioner, 845 F.2d 148, 151 (7th Cir. 1988), affg. T.C. Memo. 1986-403; Diamond v. Commissioner, 92 T.C. 423, 439 (1989), affd. 930 F.2d 372 (4th Cir. 1991). [2]
*177 As the foregoing cases demonstrate, when a partnership contracts out the performance of the research and development in which it intends to engage, all of the surrounding facts and circumstances are relevant to the inquiry into whether it has any realistic prospect of entering into a trade or business with respect to the technology under development. The inquiry includes consideration of the intentions of the parties to the contract for the performance of the research and development, the amount of capitalization retained by the partnership during the research and development contract period, the exercise of control by the partnership over the person or organization doing the research, the existence of an option to acquire the technology developed by the organization conducting the research and the likelihood of its exercise, the business activities of the partnership during the years in question, and the experience of the partners. Absent a realistic prospect that the partnership will enter a trade or business with respect to the technology, the partnership will be treated as a passive investor, not eligible for deductions under section 174. In the instant case, petitioners seek *178 to distinguish themselves from the foregoing cases by pointing to the fact that no written option existed concerning the Partnership's grant of a license to market any technology developed in the future. They further contend that the Partnership had no understanding with Dr. Platt concerning a future license of the "Product". Petitioners have the burden of proving the existence of a realistic prospect of entering into a trade or business. Establishing that an understanding did not exist with respect to the future license of the "Product" thus is a part of petitioners' burden of proof. As we begin our inquiry, we note at the outset that the "minimum royalties payable" to the Partnership by Dr. Platt during the years 1984 through 1987 under the License Agreement offset the "research and development payments" to be made by the Partnership to Platt Research and Development under the R & D Agreement during such years. Further, under the Assignment Agreement, Genetic had no right to share in such "minimum royalties received" by the Partnership. Under the Assignment Agreement, in each of the fiscal years ending June 30, 1984, through June 30, 1987, Genetic did not have any right to *179 receive any portion of the Partnership's receipts from its exploitation of the technology acquired from Genetic until after the Partnership had annual minimum receipts of $ 210,000. Although petitioners offered testimony that no "pre-existing understanding" concerning a future license existed, we find such testimony to be self-serving and unconvincing. Mr. Reimer, the Partnership's managing partner, did not satisfactorily explain why the Assignment Agreement specifically allowed the Partnership to first receive minimum annual proceeds of $ 210,000 only during the years 1984 through 1987. The exemption of such specific amounts for such specific period appears to be more than mere happenstance; such exemption indicates to us the possibility that an understanding regarding a future license existed. Mr. Reimer testified that the $ 210,000 in annual minimum receipts exempted and allowed by the Assignment Agreement to the Partnership during years 1984 through 1987, was a "negotiated" figure. He explained that the Partnership entered into the R & D Agreement under which it was obligated to pay $ 1.25 million concurrently with the Assignment Agreement. According to Mr. Reimer, he told *180 Dr. Platt that we would pay you in addition to the $ 1,250,000 [under the R & D Agreement,] a contingent amount for the existing technology, but before you would get over and above the $ 1,250,000 we wanted to receive back $ 840,000 because we had put in so much money and we thought that the new money was entitled to receive back that amount.
Nonetheless, the $ 210,000 of annual minimum receipts excluded and allowed to the Partnership by the Assignment Agreement also matches the annual amounts the Partnership was required to pay under the R & D Agreement on each July 1 during the years 1984 through 1987. Moreover, under the License Agreement, Dr. Platt agreed to pay the Partnership, each June 30 during the years 1984 through 1987, minimum annual royalties of $ 210,000. Petitioners' witnesses testified that there was no pre-existing arrangement or understanding that the Partnership would later grant such a license to Dr. Platt and Mr. Reimer testified that he did not become convinced until the end of 1982 that Dr. Platt and Genetic were the right marketers for the Partnership's product. Yet, Mr. Reimer did not convincingly explain why the Assignment Agreement permitted *181 the Partnership only $ 210,000 of annual minimum receipts during the years 1984 through 1987, instead of allowing the Partnership's partners the right to first recover the $ 840,000 they had invested without regard to any specific time periods. As of December 17, 1981, no commercially salable products had been developed from the monoclonal antibody technology research work that the Partnership was acquiring from Genetic. Considerable additional research and experimentation was required and no successful development of commercial products could have been anticipated with certainty. Moreover, even if successful commercial products could have eventually been developed, absent a prearranged license with Dr. Platt, petitioners have not established the likelihood that the Partnership would actually earn $ 210,000 of annual proceeds during years 1984 through 1987. Furthermore, petitioners have not shown how the rights Dr. Platt obtained as a licensee under the Licensee Agreement were actually worth the $ 840,000 in "minimum royalty payments" he obligated himself to make during 1984 through 1987. As of June 1984, as noted in the registration statement the company filed with the Securities *182 and Exchange Commission, Genetic had not yet commenced the commercial marketing of any diagnostic products. While several potential products had been developed, further testing and review of the products by governmental authorities was required. Indeed, in light of the Partnership's need to obtain $ 840,000 of prearranged and offsetting "minimum royalties payments" under a license with Dr. Platt, in his March 1982, letter to Genetic's shareholders, he stated that it was "virtually certain" the license agreement he described in the letter would be executed. The offsetting $ 840,000 of "research and development payments" and $ 840,000 of "minimum royalties" merely allowed the Partnership to artificially inflate and overstate the amount of payments to be made under the R & D Agreement, resulting in overstated deductions under section 174 for 1981 and 1982. Petitioners have failed to establish that the $ 840,000 which the Partnership was purportedly obligated to "pay" during 1984 through 1987 would ever see its way to fund any actual research and experimentation. In view of Genetic's financial condition, the only funding available to pay for research and experimentation was the cash *183 payments to be made by the Partnership. Yet, the $ 840,000 that was purportedly obligated to be paid by the Partnership during 1984 through 1987 would be made "available" to Dr. Platt and Genetic only after the R & D Agreement terminated on June 30, 1984. [3] In reality, no funds would actually change hands, as the $ 840,000 "paid" by the Partnership during years 1984 through 1987 would merely be offset by the $ 840,000 of "minimum royalties" it would "receive" during the same period. That the offsetting and matching "payments" were made on the same dates by way of checks drawn on accounts the Partnership and Platt Research & Development maintained with the same bank, supports our conclusion. Although the Partnership appears to have been entitled to manufacture and market the technology developed by Genetic in form, the record in the instant case does not establish that the Partnership ever intended to do so. The total capital contributed to *184 the Partnership by its partners was $ 840,000. During years 1981 through 1983, the Partnership would expend essentially all of the funds it received from its partners. After 1983, only a very small amount of capital would remain to fund any potential business activities involving its diagnostic products. The Partnership Agreement provided that "Except as they may be obligated by law or this Agreement to do so, the Partners shall not be required to make any further capital contribution to the Partnership." Had the License Agreement not been prearranged with Dr. Platt, the Partnership would have been required to come up with an additional $ 840,000 to fund the obligations under the R & D Agreement. We are not convinced that the partners had any intention of contributing another $ 840,000 in cash and they certainly were not required to do so. In conclusion, we hold that petitioners have not established the existence of any realistic prospect that the Partnership would enter into a trade or business. Consequently, we sustain respondent on the issue of the section 174 deduction. In light of our holding, we need not reach respondent's alternate arguments that (1) Mr. Stauber was not *185 at risk with respect to his share of the $ 500,000 in claimed research and development expenditures deducted by the Partnership for 1982 and (2) the Partnership was not engaged in an activity for profit. Miscellaneous Partnership Deductions
In addition to disallowing the deduction for research and development expenditures claimed by petitioners pursuant to section 174, respondent disallowed deductions relating to Partnership expenses, including accounting and legal fees, a check printing fee, interest, and a management fee. Petitioners have the burden of proof regarding such deductions. Rule 142(a). As indicated above, the Partnership was no more than an investor with respect to the research and experimentation activities. Petitioners have failed to establish that, during 1982, the Partnership was in anything other than a startup or preoperating phase. The fact that an entity organizes itself with funds from investors, enters into contracts, and incurs expenses does not prove that the entity has entered into a trade or business or, by analogy, an income-producing activity. Richmond Television Corp. v. United States, 345 F.2d 901 (4th Cir. 1965), vacated *186 per curiam on other grounds 382 U.S. 68 (1965). To be deductible, petitioners must prove that the expenses in question were something more than "costs of starting up a new * * * income-producing activity". Hardy v. Commissioner, 93 T.C. 684, 690 (1989), remanded by unpublished order (10th Cir., Oct. 29, 1990). See Harris v. Commissioner, T.C. Memo. 1990-80, for an in-depth discussion of such expenses. In the instant case, the only income-producing activity in which we find the Partnership intended to engage was the licensing of the diagnostic products and technology developed by Genetic in exchange for "royalty" income. During 1982, the diagnostic products were still being "invented" and were not of commercial viability. Licensing of anything to parties other than Genetic thus was not feasible during 1982. Although the Partnership did enter into the License Agreement with Dr. Platt during early 1983, as we indicated above, the "minimum royalties paid" to the Partnership during 1984 through 1987 were merely offsetting payments. Even as of June 1984, Genetic had not commenced the commercial marketing of any diagnostic products. *187 In fact, the record does not reflect whether the Partnership ever received any royalty payments beyond the offsetting payments. Accordingly, we sustain respondent's disallowance of the miscellaneous Partnership deductions. Respondent also disallowed a deduction related to Mr. Stauber's allocable share of the Partnership's organizational expenses, which the Partnership elected to amortize over a 60-month period pursuant to section 709(b). We find that such organizational expenses were properly amortized by the Partnership. Diamond v. Commissioner, 92 T.C. 423, 445-446 (1989), affd. 930 F.2d 372 (4th Cir. 1991); Harris v. Commissioner, supra.
Additions To Tax
Respondent determined additions to tax for negligence under section 6653(a) against petitioners for 1982. Petitioners bear the burden of proving that respondent's determination is incorrect. Rule 142(a). Negligence is defined as a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners contend that they relied on the *188 professional advice of their accountant, Mr. Reimer. Mr. Reimer's accounting firm prepared both the Partnership's 1982 return and petitioners' 1982 return. Mr. Reimer, however, was instrumental in the Partnership's formation and acted as its managing partner. As the promoter of the Partnership venture, he was not an outside, unbiased, and objective adviser. At trial, Mr. Reimer testified that, during December 1981, he sought and obtained tax advice from one of petitioners' counsel that the Partnership's research and development expenditures qualified for deduction under section 174. According to Mr. Reimer, that attorney reviewed the Partnership's research and development agreement for purposes of determining whether the expenditures were qualified research and experimental expenditures. The record, however, does not reflect whether such "outside adviser" was apprised of all the relevant facts, and whether Mr. Reimer had informed that adviser of the arrangements regarding a future license described by Dr. Platt in his March 5, 1982, letter to Genetic's shareholders. Collins v. Commissioner, 857 F.2d 1383 (9th Cir. 1988), affg. T.C. Memo. 1987-217. *189 As we understand their briefs, petitioners have not contended they should be relieved of liability for the negligence additions because of such consultation by Mr. Reimer with petitioners' counsel. In any case, petitioners bear the burden of proof. Rule 142(a). Moreover, the record is vague with respect to the specific advice given to Mr. Stauber by Mr. Reimer and the details of what Mr. Stauber knew or did not know about the arrangements between the Partnership and Dr. Platt and Platt Research and Development. Although reliance on the advice of professionals may defeat a finding of negligence under certain circumstances, petitioners have not shown that the reliance in the instant case was reasonable. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S.    , 111 S. Ct. 2631 (1991). [4] We hold that petitioners have failed to establish that they were not negligent.
*190 Respondent determined an addition to tax for substantial understatement under section 6661 against petitioners, in an amount equal to 25 percent of their understatement for 1982. To be considered substantial, the understatement must exceed the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). Respondent contends that petitioners are liable for the addition under section 6661 because substantial authority supporting the claimed treatment of the disallowed items did not exist, and because petitioners did not adequately disclose the relevant facts concerning the disallowed items on their return. See sec. 6661(b)(2)(B)(i) and (ii). Petitioners argue that the Supreme Court's decision in Snow v. Commissioner, 416 U.S. 500 (1974), is substantial authority supporting their treatment of the disallowed items. We hold that petitioners have shown neither substantial authority supporting their treatment of the disallowed items nor disclosure of the relevant facts affecting the treatment of the disallowed items on their return. We have held above that petitioners have not established that the Partnership had any realistic *191 prospect of entering into a trade or business. The decision in Snow v. Commissioner, supra, did not dispense with such requirement. Indeed, in Snow the Supreme Court relied heavily on legislative history which stated that the deduction provided under section 174 would be particularly valuable to small and growing businesses. Consequently, the instant case is materially distinguishable from Snow. See sec. 1.6661-3(b)(3), Income Tax Regs.
If the Rule 155 proceeding we order below discloses that the section 6661(b)(1)(A) threshold amount is met, petitioners will be liable for the section 6661 addition to tax. Decision will be entered under Rule 155. Footnotes
1. In the letter, Dr. Platt also noted that Genetic had not sold the partnerships Genetic's work regarding products unrelated to human or animal diagnostic testing purposes, such as potential products for therapeutic or immunological purposes. He stated, however, that the development of such therapeutic or immunological products would take a number of additional years.↩
2. See also Double Bar Chain Co., Ltd. v. Commissioner, T.C. Memo. 1991-572; Coleman v. Commissioner, T.C. Memo. 1990-357; Alexander v. Commissioner, T.C. Memo. 1990-141; Harris v. Commissioner, T.C. Memo. 1990-80; Everett v. Commissioner, T.C. Memo. 1990-65↩.
3. See Hattier v. Commissioner, T.C. Memo. 1990-2↩.
4. See also Coleman v. Commissioner, T.C. Memo. 1990-511↩.