MEDICAL MOBILITY LIMITED PARTNERSHIP I, MALOUF ABRAHAM, JR., A PARTNER OTHER THAN THE TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Medical Mobility Ltd. Partnership I v. Commissioner
Docket Nos. 1317-91, 1383-91
United States Tax Court
T.C. Memo 1993-428; 1993 Tax Ct. Memo LEXIS 439; 66 T.C.M. (CCH) 741; September 14, 1993, Filed *439 Decisions will be entered for respondent except as to the organizational expense deductions. For petitioner: Stephen T. Krier and Karl Norman Clifford. For respondent: Steven B. Bass. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: By notices of final partnership administrative adjustment (FPAA's) respondent determined the following adjustments to the partnership returns of income of Medical Mobility Limited Partnership I (MMI) for the taxable years 1984 and 1985: 1984
Partnership Deductions
As Reported
As Adjusted
Research & development
$ 284,357
-0-
Amortization and depreciation
30,051
-0-
Organization expense
500
-0-
1985
Partnership Deductions
As Reported
As Adjusted
Amortization and depreciation
$ 30,051
-0-
Organization expense
500
-0-
The issues for decision are: (1) Whether MMI was entitled to deductions under section 174(a) [1] for research and experimental expenditures paid in 1984; (2) whether MMI was entitled to elect under section 58(i) to amortize its 1983 research and experimental expenditures over a 10-year period so as to be entitled to amortization deductions in 1984 and 1985; and (3) whether MMI was entitled *440 to deduct for 1984 and 1985 a ratable portion of its 1983 organizational expenses after electing to amortize them under section 709(b). For the reasons discussed below, we hold for respondent on issues (1) and (2), but hold for petitioner on issue (3). FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner, who is a partner other than the tax matters partner of MMI, was a resident of Canadian, Texas, when he filed the petitions in this case. Petitioner is a physician who, since 1968, has been a general practitioner and allergy specialist. Petitioner also has interests in helping disabled persons and senior citizens. In addition to donating money to local charities, petitioner has participated in a program called Teaching Pathways to help persons with learning disabilities. Petitioner's *441 long-time friend, Joe Brock, who also became a partner in MMI with petitioner, but has since died, also participated in Teaching Pathways. Petitioner and Brock had also invested together in several very profitable Texas oil and gas ventures. In fall 1983, petitioner's friend and financial adviser, Fred Adcock, told petitioner and Brock about an investment opportunity in a high-tech wheelchair known as the Alexis. Adcock first heard about the Alexis, which had been developed at the Veterans Administration Research and Rehabilitation Institute in Palo Alto, California, from two friends and fellow businessmen, Dr. Larry Miller and Jon King. Adcock, Miller, and King had visited the V.A. Institute in Palo Alto and had seen a working prototype of the Alexis. They were enthusiastic about the Alexis and interested in developing, manufacturing, and bringing it to market. Later in 1983, petitioner visited Dr. William H. T. La, the inventor of the Alexis, at the V.A. Institute in Palo Alto. Petitioner received a tour of the Institute and saw various robotic machines and prostheses the V.A. had developed, including a working prototype of the Alexis. Petitioner also test drove the Alexis. *442 The Alexis is a nonconventional "smart" wheelchair that uses a system known as "metamotion", employing three independently motor-driven nonparallel wheels linked by an on-board computer. This feature, patented by Dr. La in 1980, allows the Alexis to move directly to any point on the horizontal plane by the rider's manipulation of a joy stick that sends an electronic signal to the computer that controls the directions of the three wheels. The Alexis also has a control feature that enables a rider unable to manipulate the joy stick to operate the Alexis by head motion. As a result, any rider of the Alexis, regardless of disability level, could make it "turn on a dime" and maneuver it in cramped spaces. On August 18, 1983, before MMI had been organized, Dr. La had entered into an option agreement with International Texas Industries, Inc. (Intex). This agreement, which characterized MMI as "a Texas limited partnership to be formed", purported to grant Intex and MMI collectively an option to acquire exclusive worldwide rights (except in France and French territories) to conduct research and development with respect to the Alexis, and to manufacture, use, sell, lease, and otherwise *443 dispose of the Alexis. Under this agreement, Dr. La was to be paid $ 8,000 plus $ 32,000 upon exercise of the option. Petitioner was very impressed with the Alexis after hearing favorable oral reports from Adcock, King, and Miller, and after seeing and test-driving the Alexis. Although petitioner had no professional expertise in wheelchairs, he believed the Alexis represented a significant advance in wheelchair design. However, the Alexis prototype was not yet marketable and required further work. Dr. La, Adcock, King, and Miller led petitioner and Brock to believe that the Alexis could be perfected and successfully marketed if sufficient funds could be raised to complete its development. Adcock, president of Alta Financial Corp. (Alta), which became MMI's general partner, persuaded petitioner and Joe Brock to contribute $ 300,000 each to MMI, to be turned over to Intex to carry out research and development on the Alexis. King was president and a director of Intex, Miller was vice president and a director of Intex, and Alta was a shareholder of Intex. On December 13, 1983, petitioner entered into a handshake deal with Adcock and wrote MMI "the biggest check * * * [he had] *444 ever written" for $ 300,000 to become a partner in MMI. Soon thereafter, in January 1984, Brock contributed approximately $ 300,000 to become a partner of MMI. At some time in 1983, Alta made a $ 3,030 capital contribution to MMI. On December 15, 1983, Intex exercised the August 18, 1983, option to acquire the exclusive license of the Alexis technology patented by Dr. La. Although this license agreement states that both MMI and Intex shall be considered licensees, the agreement was executed only by Dr. La individually and by Miller on behalf of Intex. There was no space for the signature of Adcock, as the president of Alta, which was to be MMI's corporate general partner. Nor did Adcock sign the agreement in any capacity. Under the license agreement, MMI was supposed to pay Dr. La the $ 40,000 provided for in the August 18, 1983, option agreement, and Intex was to pay Dr. La 120,000 shares of Intex stock. Intex and MMI were also supposed to pay Dr. La a collective royalty of 1.5 percent of the gross sales of the Alexis. In addition, for each quarter commencing with the fifth quarter after the signing of the license agreement, MMI and Intex were supposed to pay Dr. La a minimum *445 royalty of $ 5,000 per quarter and after the ninth quarter, a minimum of $ 10,000 per quarter. In fall 1983, MMI circulated a confidential offering memorandum soliciting investors to purchase four units of partnership interest for $ 300,000 each. According to the offering memorandum, all the capital contributed to MMI, $ 1.2 million maximum, was to be turned over to Intex pursuant to a (never executed) research and development agreement between MMI and Intex under which Intex would conduct research and development on the Alexis on behalf of MMI. Under that agreement, the $ 1.2 million was payable to Intex in installments of $ 300,000 in December 1983 and $ 900,000 in April 1984. According to MMI's partnership agreement, which also was never completely executed, MMI was to commence operations when it had received 25 percent of the $ 1.2 million called for in the offering memorandum. Petitioner and Brock finally signed the partnership agreement on December 3, 1984, and February 5, 1985, respectively, and MMI finally registered to become a limited partnership on February 19, 1985. MMI raised only the capital contributed by petitioner, Brock, and Alta, and never reached its $ 1.2 *446 million goal. Under a separate license option agreement, which also was never executed, Intex was to have an option to acquire a nonexclusive license to the Alexis technology it had developed pursuant to the research and development contract with MMI. Upon exercise of the nonexclusive license option, Intex was to pay MMI a quarterly royalty of 2 percent of its gross revenues from the sale of products incorporating the Alexis technology. In addition, the license option agreement provided that if Intex exercised the nonexclusive license option, it would have the option to acquire an exclusive worldwide license to the Alexis technology. MMI paid Intex $ 291,786 and $ 284,357 in 1983 and 1984, respectively, for research and development on the Alexis project. All capital raised by MMI, with the exception of amounts used for a capital outlay to Dr. La and MMI's organizational and syndication expenses, was paid to Intex to fund the research and development on the Alexis. During the years 1984 and 1985, MMI had no earnings, employees, or operational expenses. From 1983 to 1985, petitioner and his partners took an active interest in Intex and the Alexis wheelchair project. In 1983, *447 prior to joining MMI as a partner, petitioner had become an Intex shareholder and, in 1984, he became a director of Intex. Intex paid petitioner shares of Intex stock as director's fees. Petitioner also cosigned notes for Intex and lent it as much as $ 400,000, which was only partially repaid in cash. After realizing that Intex was not going to fully repay the loans in cash, petitioner accepted Intex stock as partial repayment. Petitioner also visited the V.A. Institute in Palo Alto several times and had conversations with Dr. La and various researchers, engineers, and other V.A. technicians who had ideas about the capabilities and uses of the Alexis. Petitioner also frequently spoke with Adcock about the progress of the Alexis and visited the Intex plant in San Antonio, Texas. Adcock, who lived in San Antonio, also had frequent contacts with Intex. Petitioner also frequently discussed the Alexis project with Brock, MMI's other partner. MMI, on its 1983 partnership return of income covering the last 2 calendar months of 1983, reported the $ 291,786 it paid Intex for research and development on the Alexis as a section 174(a) research and experimental expense. Without any explanation *448 or any explicit election, MMI claimed an amortization deduction on its 1983 return of $ 29,179, one-tenth of the total amount paid to Intex for research and development. [2]MMI also claimed a $ 56 depreciation deduction, computed using a 17-year useful life and the straight line method, for the patent license that it purportedly had acquired from Dr. La for $ 5,714. MMI also reported on its 1983 return that it had spent $ 2,500 in legal fees for negotiating and preparing its partnership agreement, elected under section 709(b) to amortize the $ 2,500 over a 60-month period as a partnership organizational expense, and claimed an $ 83 depreciation deduction for the last 2 months of 1983. MMI did not report any income for 1983 and reported a total loss of $ 29,318. *449 On the Schedules K-1 issued to petitioner and Alta, MMI allocated the $ 29,318 partnership loss for 1983 as follows: Partner
Distributive Share
Malouf Abraham, Jr., M.D.
$ 29,025
Alta Financial Corp.
293
On its 1984 and 1985 partnership returns, MMI reported a $ 30,051 depreciation deduction. MMI reported the partners' distributive shares of this deduction on Schedules K-1 attached to its 1984 and 1985 returns as follows: Partner
Distributive Share
Malouf Abraham, Jr., M.D.
$ 29,715
Joe Brock
531
Alta Financial Corp.
305
The $ 30,051 deduction consisted of $ 29,179 of MMI's 1983 amortized research and experimental expenditure, $ 336 of depreciation of the patent expense, and $ 536 of some other unexplained expense. On the Schedules K-1 attached to its 1984 partnership return, MMI reported a $ 284,357 research and development expense deduction. MMI reported the partners' distributive shares of this deduction on the Schedules K-1 issued to Brock and Alta as follows: Partner
Distributive Share
Joe Brock
$ 281,428
Alta Financial Corp.
2,929
These amounts were not reported as deductions on the face of the Form 1065 but appeared only on the Schedules *450 K-1. Respondent's FPAA's treated these entries as partnership items. MMI did not have and did not report any income on its 1984 and 1985 partnership returns. Since 1985, petitioner has not received a Schedule K-1 of his distributive share of MMI partnership income and deductions. Although Intex had made some progress on the Alexis project, by mid-1984 it was running out of money and the project had fallen behind schedule. In an effort to keep the Alexis project going, Adcock formed two other partnerships in 1984: Medical Mobility Limited Partnership II (MMII) and Medical Mobility Limited Partnership III (MMIII). New investors in these partnerships contributed additional risk capital, which was paid to Intex. Adcock also arranged for Alta to be the general partner of MMII and MMIII. Later in 1984, Edward M. Johnson, president of Blue Chip Securities Corp., an investment banking firm, formed another partnership, Medical Mobility Limited Partnership IV (MMIV), to inject more funds into Intex in an effort to enable it to complete the Alexis project. Blue Chip was also the general partner of MMIV. Upon formation of MMIV, Johnson and his attorney became concerned that none of *451 the new Medical Mobility partnerships owned any rights to the Alexis technology. In order to enable all four Medical Mobility partnerships (MMI, MMII, MMIII, and MMIV) to have an interest in the Alexis technology, enjoy the tax benefits thought to be associated therewith, and share in the royalties to be paid by Intex, in November 1984, the four partnerships formed a joint venture, managed by Johnson, known as Medical Mobility Joint Venture (MMJV). Under a contract known as the Existing Technology Agreement, MMI purported to assign to MMJV an exclusive license to develop the Alexis pursuant to a research and development contract with Intex. The Existing Technology Agreement was executed on November 6, 1984, by Adcock, as president of Alta, general partner of MMI, and Johnson, president of Blue Chip Securities, manager of the Joint Venture. MMJV concurrently executed a nonexclusive license option agreement, an exclusive license option agreement, and a research and development agreement with Intex. Under these agreements, Intex was to continue its research and development on the Alexis and to have options to both an exclusive and a nonexclusive license to manufacture, use, sell, *452 lease, and otherwise dispose of the Alexis technology developed under the research and development contract with MMJV. Intex, in return, was to pay MMJV a royalty equal to 7.1 percent of gross revenues from the commercial exploitation of the Alexis. [3] Intex purported to exercise both of these options in 1987. At some time in 1983, Intex had transferred to its research and development subsidiary, Intex Medical Technologies, Inc. (IMTI), the contract rights Intex had supposedly acquired from MMI. Intex also promptly transferred to IMTI the rights it acquired from MMJV under the Existing Technology Agreement. In 1986, IMTI produced its first and only run of Alexis wheelchairs for commercial distribution and entered into an exclusive domestic marketing agreement with *453 Glasrock Home Health Care, an Atlanta-based company with over 250 retail outlets. However, this production run had quality control problems and Glasrock returned the wheelchairs for redesign and remanufacture. IMTI has been unable to perfect the Alexis and market it at an affordable price. On May 3, 1989, IMTI voluntarily filed for reorganization under chapter 11 of the Bankruptcy Code. Since IMTI's bankruptcy filing, the Alexis project has been on hold. Alta appears to be defunct, and petitioner has not heard from Adcock, King, or Miller and has not recovered any part of his $ 300,000 investment. OPINION This partnership proceeding is governed by the procedural rules of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(a), 96 Stat. 648, codified as secs. 6221-6233. Under section 6221, the tax treatment of partnership items is determined at the partnership level. It bears observing at the outset that although the transactions entered into by petitioner and MMI to develop the Alexis were partially tax motivated, in that they were intended to take advantage of section 174(a), petitioner and MMI had a bona fide profit objective. As we recognized *454 in James v. Commissioner, 87 T.C. 905, 918 (1986)(citing Frank Lyon Co. v. United States, 435 U.S. 561, 580 (1978)), affd. 899 F.2d 905 (10th Cir. 1990), taxpayers are entitled to try to obtain favorable tax results so long as the transaction is compelled or encouraged by nontax business reasons. MMI invested a substantial amount of money in the Alexis and hoped to make a profit. MMI was not the kind of abusive tax shelter that courts have disregarded under section 183(a) as lacking an actual and honest profit objective. See Agro Science Co. v. Commissioner, T.C. Memo. 1989-687, affd. 934 F.2d 573 (5th Cir. 1991). Even though MMI had the requisite profit objective, we have concluded that MMI is not entitled to section 174(a) research and experimental expenses deductions for 1984 because it lacked a realistic prospect of entering a trade or business that exploited the Alexis. Zink v. United States, 929 F.2d 1015, 1021 (5th Cir. 1991). MMI also is not entitled to elect to amortize its 1983 research and *455 experimental expense under section 58(i), inasmuch as the section 58(i) election is made at the individual level rather than the partnership level. However, MMI is entitled to deduct for 1984 and 1985 a ratable portion of its 1983 organizational expenses, which it had elected to amortize under section 709(b). A. Research and Experimental Expenditures for 1984
Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Allowance of a section 162(a) business expense deduction requires that the taxpayer be carrying on a trade or business when the expense is paid or incurred. See Commissioner v. Groetzinger, 480 U.S. 23 (1987). In order to encourage research and experimentation by small pioneering enterprises and to place them on an equal footing with established firms, Congress enacted section 174(a) to allow a deduction for research and experimental expenses paid or incurred during the taxable year "in connection with" a trade or business. Sec. 174(a); [4]Snow v. Commissioner, 416 U.S. 500, 503-504 (1974); S. Rept. *456 1622, 83d Cong., 2d Sess. 33 (1954). Unlike section 162(a), section 174(a) allows a deduction for qualifying expenditures paid or incurred "in connection with" a trade or business, as opposed to the more strict requirement of "carrying on" a trade or business. Snow v. Commissioner, supra at 503 (emphasis supplied). To be entitled to section 174(a) research and experimental expense deductions, the taxpayer is not required currently to produce or sell any product or to be currently engaged in a trade or business. Id. at 503-504; Zink v. United States, supra at 1021; Levin v. Commissioner, 832 F.2d 403, 405 (7th Cir. 1987), affg. 87 T.C. 698 (1986). However, not every expenditure having some relationship to research and experimentation is deductible under section 174(a). As the U.S. Court of Appeals for the Seventh Circuit explained in Spellman v. Commissioner, 845 F.2d 148, 149 (7th Cir. 1988), affg. T.C. Memo. 1986-403, the Supreme Court's decision in Snow v. Commissioner, supra, *457 "makes it important to determine whether the prospects for developing a new product that will be exploited in a business of the taxpayer are realistic". Unless there is a realistic prospect that the taxpayer will ultimately engage in a trade or business that exploits the developed technology, a research and experimental expenditure cannot be said to have been paid or incurred "in connection with" a trade or business. Zink v. United States, supra at 1023; Diamond v. Commissioner, 92 T.C. 423, 438-443 (1989), affd. 930 F.2d 372 (4th Cir. 1991). Whether there is any realistic prospect of entering into a trade *458 or business exploiting the technology under development is a mixed question of law and fact. Zink v. United States, supra at 1020-1021. In making this determination, we consider such facts and circumstances as the intentions of the parties to the research and development contract, the amount of capitalization retained by the partnership during the research and development contract period, the exercise of control by the partnership over the person or organization conducting the research and development, the existence of an option to acquire the technology developed by the organization conducting the research and development and the likelihood of its exercise, the business activities of the partnership during the years in question, and the business experience of the partners. See Stauber v. Commissioner, T.C. Memo. 1992-128; Double Bar Chain Co. v. Commissioner, T.C. Memo. 1991-572. These factors can be reduced to two principal factors that determine whether there is a realistic prospect that the partnership will enter a trade or business exploiting the developed technology: (1) The *459 objective intent to enter such a trade or business; and (2) a capability of doing so. See Kantor v. Commissioner,     F.2d     (9th Cir. July 20, 1993), affg. on this issue and revg. on another issue T.C. Memo. 1990-380. Unless petitioner establishes that MMI had both an objective intent to manufacture and market the Alexis and the likely capability of doing so, MMI will not be eligible for deductions under section 174(a). Id. In determining whether MMI had a realistic prospect of engaging in a trade or business exploiting the Alexis technology, we may take into account MMI's actions during and after the years in issue. Levin v. Commissioner, supra at 406 n.3. While all facts and circumstances are relevant to whether the taxpayer had a realistic prospect of entering into a trade or business in connection with the developed technology, the taxpayer can neither have the objective intent to manufacture and market the product embodying the developed technology nor the likely capability of doing so if the taxpayer disposes of all incidents of ownership in the technology by granting an exclusive license to *460 a third party in exchange for a royalty interest. Diamond v. Commissioner, supra at 438; Levin v. Commissioner, 87 T.C. at 725-727; see Green v. Commissioner, 83 T.C. 667, 689 (1984). It is the licensee, rather than the licensor, who earns profits from the sale of the product; the licensor merely collects royalties from the licensee. Thus, by granting an exclusive license, the licensor is deprived of control over the manufacture, use, and sale of the product, and the licensee is the one engaged in the trade or business of exploiting the developed technology. As a mere passive investor, the licensor will not be entitled to a deduction under section 174(a) for research and experimental expenditures. Zink v. United States, 929 F.2d at 1022-1023; Diamond v. Commissioner, supra at 443. Similarly, where the taxpayer grants an option to acquire an exclusive license in the developed technology, the taxpayer has no realistic prospect of engaging in a trade or business "in connection with" the licensed technology, regardless *461 of whether the optionee exercises its option. As explained in Spellman v. Commissioner, supra at 149-151, and Diamond v. Commissioner, supra at 438-439, this is because the optionee will probably exercise the option if the economic benefits of doing so outweigh the burdens. If the option is exercised, the grantor will thereafter have no legal right to manufacture, use, sell, or lease the patented article or product of the technology because such rights will be vested in the licensee. If, on the other hand, the economic burdens of exercising the option outweigh the prospective benefits, the optionee probably will not exercise the option. Even if the grantor has sufficient resources to bring the product to market, it is unlikely that he will do so, in the face of the optionee's appraisal that the project is not commercially viable. Under these scenarios, the grantor of the option will be either contractually or economically foreclosed from exploiting the technology. Kantor v. Commissioner, supra; Spellman v. Commissioner, supra; Diamond v. Commissioner, supra. *462 Consequently, the grantor of an option to acquire an exclusive license has neither the objective intent nor the likely capability of entering a trade or business in connection with the developed technology, Kantor v. Commissioner, supra, and therefore cannot have a "realistic prospect" of entering a trade or business that exploits the developed technology. As a result, such a grantor is not entitled to deductions under section 174(a) for research or experimental expenditures with respect to such technology. Id.; Spellman v. Commissioner, supra; Diamond v. Commissioner, supra.
In this case, during late 1983 and early 1984, we have an unexecuted research and development agreement and option agreement that purport to say that Intex would conduct research and development on the Alexis technology on behalf of MMI and that, in exchange for a 2-percent royalty interest, MMI would grant Intex a nonexclusive license option to manufacture, produce, and market. Under that option agreement, if Intex had exercised the option, it would have become entitled to exercise a second option to acquire an exclusive license *463 to the Alexis technology to manufacture, produce, and market products incorporating the Alexis technology. Although these unexecuted agreements could not accurately reflect the actual legal relationships between MMI and Intex in 1983, it is clear, from the totality of MMI's dealings with Intex, that Adcock, as the person who controlled Alta (first, prospectively, and then, actually, the general partner of MMI), and Intex intended to enter into such agreements. Moreover, it is clear that MMI, through its participation in MMJV, derivatively contracted with Intex later in 1984 for Intex to conduct research and development on the Alexis, and that MMI thereby granted Intex an option for an exclusive license to the Alexis technology in 1984 upon whose exercise MMI was to receive a royalty from Intex through MMJV. Even if Intex had not exercised its options, MMI could not have gone into the business of manufacturing and marketing the Alexis because it lacked the financial resources to do. MMI never even raised the $ 1.2 million needed to perfect the Alexis under the original plan and the additional amounts raised by the later-formed Medical Mobility partnerships were insufficient to *464 perfect the Alexis. Petitioner has produced evidence that he was a hands-on participant in MMI and not just a passive investor. He also testified in general terms that he and his partner Joe Brock had substantial financial resources that they could have used to bring the Alexis to commercial production. However, petitioner has not proven that he and Brock actually had such resources and the willingness to commit them to the completion of the Alexis project. If petitioner, Brock, and MMI had such resources and willingness, additional capital from the three other Medical Mobility partnerships comprised of other investors would not have been needed for Intex to complete the Alexis project. Petitioner has not carried his burden of proving that MMI had sufficient funds and objective intention to bring the Alexis far enough along to begin manufacturing and marketing it. Rule 142(a); see Grindle v. Commissioner, T.C. Memo. 1993-297; Sivic v. Commissioner, T.C. Memo. 1993-54. Petitioner's personal participation in MMI's activities is overshadowed by the fact that during 1984 MMJV granted Intex options to acquire the exclusive *465 rights to manufacture, use, sell, lease, and otherwise exploit the Alexis technology. As a result, neither MMI nor MMJV had a realistic prospect during 1984 of entering into a trade or business that exploited the Alexis technology to be developed by Intex. The existence of the executed license agreements between MMJV and Intex is dispositive of the section 174(a) issue for 1984, and we need not address the effect of the other factors set forth above, such as the substantiality of petitioner's activities. As the Court of Appeals said in Zink v. United States, supra at 1021, The management of investments * * * is not a trade or business, regardless of how extensive or complex the investment portfolio or how much time is required to manage such investments.
See also Green v. Commissioner, 83 T.C. 667, 668 (1984). MMI and MMJV were investment vehicles that allowed petitioner, his partners, and the joint venturers, who all thought they saw potential profits in the Alexis, to pool their financial resources in an effort to realize those profits. They invested risk capital with MMI and MMJV, which turned over *466 to Intex the money needed for research and development as well as options to manufacture and sell the Alexis. By so doing, MMI and MMJV gave up any meaningful proprietary rights they would ever have had to manufacture and market the Alexis. While petitioner's activities were not insubstantial and reflected his personal commitment to the Alexis project, they do not provide a sufficient basis for us to conclude that MMI had a realistic prospect of entering a trade or business in connection with the Alexis. We therefore hold that MMI was not entitled to any deduction for the taxable year 1984 under section 174(a) for research and experimental expenditures. There is an additional ground for denying MMI deductions under section 174(a). Although the parties have apparently assumed to the contrary in the presentation of this case, the record created by petitioner does not show that MMI ever had any enforceable rights to the Alexis technology that would entitle it to manufacture, use, sell, lease, or otherwise dispose of the Alexis. Neither the August 18, 1993, license option agreement between Dr. La, Intex, and MMI (which had not yet been organized as a partnership) nor the December *467 15, 1983, license agreement between Dr. La and Intex effectively transferred any rights in the Alexis to MMI. Consequently, we are hard put to conclude, even if Intex did not have options to acquire an exclusive license to exploit the Alexis, that MMI would be entitled to section 174(a) research and development expense deductions for 1984. The record reflects a lack of observance of business formalities by all parties concerned. The record contains unexecuted agreements, agreements partially executed at later dates, undocumented agreements, and incomplete and unclear agreements. Without more we are unable to find that MMI actually ever acquired the rights to exploit the Alexis and to contract with Intex to conduct research and development with respect to the Alexis on MMI's behalf. While MMI had every right to enter into a contract with Intex, the record in this case does not support a finding that MMI owned technology rights in the Alexis that would entitle it to a section 174(a) deduction. B. 1984 and 1985 Section 58(i) Amortization Deductions
MMI's 1984 and 1985 partnership returns each claimed a $ 30,051 depreciation deduction. Respondent disallowed these deductions *468 "because it has not been shown that the amounts claimed were ordinary and necessary expenses paid or accrued [sic] during the taxable year in carrying on any trade or business." From MMI's 1983 return, it appears that $ 29,179 of each of the 1984 and 1985 depreciation deductions was one-tenth of MMI's 1983 research and experimental expenditure that MMI had "elected" on its 1983 return to amortize over 10 years. The record does not clearly reveal and petitioner made no effort to explain of what the $ 872 balance of the $ 30,051 depreciation deductions consisted. However, we surmise that $ 336 of that balance was for depreciation of the $ 5,714 MMI supposedly paid Dr. La for the license to the Alexis patent. There is nothing on MMI's returns for the years 1983 through 1985 that indicates the nature of the remaining $ 536. We sustain respondent's disallowance of the 1983 research and experimental amortization deductions claimed in 1984 and 1985 in the amount of $ 29,179, but on other grounds discussed below. Furthermore, inasmuch as petitioner has not proffered any evidence or made legal argument that explains why MMI should be entitled to any part of the $ 872 balance of the $ *469 30,051 depreciation deductions, we sustain respondent's determination in its entirety. Petitioner, on brief, argues that MMI was entitled to amortize its 1983 section 174(a) deductions under section 58(i). [5] Section 58(i) permits individual taxpayers, who properly make an election, as provided in section 5f.0(a)(3), Temporary Income Tax Regs., 48 Fed. Reg. 1487 (Jan. 13, 1983), to amortize over a 10-year period certain deductions that would otherwise be treated as "items of tax preference" under the alternative minimum tax (AMT). Secs. 58(i)(7), 57(a). Included among the items of tax preference for which a section 58(i) election is allowed are deductions under section 174(a) for research and experimental expenditures. Sec. 58(i)(2)(B). *470 Petitioner argues that respondent is precluded from disallowing the amortization deductions claimed on its 1984 and 1985 returns because section 58(i) provides that "any qualified expenditure to which an election under this paragraph applies shall be allowed as a deduction ratably over the 10-year period beginning with the taxable year in which such expenditure was made." Sec. 58(i) (emphasis added). According to petitioner, inasmuch as respondent has not made any determination with respect to MMI's 1983 return, the year in which the election purportedly was made, respondent thereby approved MMI's characterization of its 1983 payment to Intex as a section 174(a) research and experimental expenditure and cannot disallow the $ 29,179 10-year amortization deductions for 1984 and 1985. Petitioner's argument is misplaced. Section 58(i)(1) applies only to individuals. Only individual partners, not partnerships, can elect to amortize qualified expenditures over 10 years for AMT purposes. Sec. 58(i)(1), (5)(D); cf. sec. 59(e)(4)(C), I.R.C. 1986. A partnership can claim a deduction under section 174(a) for the year it pays or incurs a research and experimental expenditure. [6] However, *471 it is the partner's distributive share of that deduction that is subject to a section 58(i) election by the individual partner. Sec. 58(i)(1), (2)(B), (5)(D). Because MMI was a partnership, it could not elect to amortize its section 174(a) expenditures under section 58(i). Sec. 58(i)(5)(D). We therefore sustain respondent's determination that MMI was not entitled to deduct $ 29,179 in 1984 and 1985 under section 58(i). In holding that MMI was not entitled to elect under section 58(i), we make no determination whether MMI could have properly deducted under section 174(a) the amount it paid Intex in 1983 or whether petitioner could have elected or did elect under section 58(i) to amortize his distributive share of such deduction on his 1983 Federal income tax return so as to be entitled properly to claim amortization deductions in subsequent years. These are nonpartnership items. Our holding that MMI is not entitled to amortization deductions *472 for 1984 and 1985 at the partnership level does not determine whether petitioner individually was entitled to deductions under section 58(i) at the individual level. C. Organizational Expenses
Section 709(a) provides as a general rule that partnerships and partners may not deduct amounts paid or incurred in the organization or syndication of a partnership. However, section 709(b) provides an exception: (b) Amortization of Organization Fees. -- (1) Deduction. -- Amounts paid or incurred to organize a partnership may, at the election of the partnership (made in accordance with regulations prescribed by the Secretary), be treated as deferred expenses. Such deferred expenses shall be allowed as a deduction ratably over such period of not less than 60 months as may be selected by the partnership (beginning with the month in which the partnership begins business), or if the partnership is liquidated before the end of such 60-month period, such deferred expenses (to the extent not deducted under this section) may be deducted to the extent provided in section 165. (2) Organizational Expenses Defined. -- The organizational expenses to which paragraph (1) applies, are expenditures *473 which -- (A) are incident to the creation of the partnership; (B) are chargeable to capital account; and (C) are of a character which, if expended incident to the creation of a partnership having an ascertainable useful life, would be amortized over such life.
On MMI's 1983 partnership return, it elected to amortize $ 2,500 in organizational expenses under section 709(b). In the FPAA's for the years 1984 and 1985, respondent disallowed MMI's $ 500 amortization deductions on the ground that "it has not been shown that the amounts claimed were ordinary and necessary expenses paid or accrued [sic] during the taxable year in carrying on any trade or business." Respondent also disallowed the section 709(b) amortization deductions because MMI was not carrying on a trade or business in 1984 and 1985. We reject respondent's determinations. The expenditures in question could not have been paid or incurred in 1984 and 1985 because they were 1983 partnership organizational expenses. We are satisfied that MMI spent at least $ 2,500 in organizational fees in 1983. While petitioner has not produced a receipt or bill for this expenditure, the record contains MMI's 1983 partnership *474 agreement, albeit unexecuted at that time. In all likelihood, the attorney's fees to prepare this document were not less than $ 2,500. See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1939). Moreover, MMI properly elected on its 1983 return to amortize organizational expenses under section 709(b) and respondent never challenged that deduction. Therefore, MMI should be allowed $ 500 in amortization deductions for 1984 and 1985. Even though, in 1984 and 1985, MMI was not carrying on a trade or business within the meaning of section 162(a) and even though it had no realistic prospect of entering a trade or business that would enable it to deduct its 1984 payment to Intex as a section 174(a) research, and experimental expenditure, MMI was entitled to elect to amortize its 1983 organizational expense under section 709(b). As we said in Diamond v. Commissioner, 92 T.C. 423, 446 (1989), affd. 930 F.2d 372 (4th Cir. 1991), "A partnership is not required to be in a trade or business in order to begin business for purposes of section 709. Section 1.709-2(c), Income Tax Regs., states that *475 a partnership 'begins business when it starts the business operation for which it was organized.'" See Double Bar Chain Co. v. Commissioner, T.C. Memo. 1991-572; Active Lipid Dev. Partners, Ltd. v. Commissioner, T.C. Memo. 1991-522. Inasmuch as MMI was organized in 1983 to fund the research and development of the Alexis and made a $ 291,786 payment to Intex for that purpose, it was entitled to select a 60-month period in which to amortize its $ 2,500 in organizational expenditures under section 709(b) and to deduct $ 500 with respect thereto in both 1984 and 1985. To reflect the foregoing, Decisions will be entered for respondent except as to the organizational expense deductions. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Sec. 174(b) allows taxpayers to elect to amortize research and experimental expenditures over a 60-month period. Sec. 58(i) allows individuals to elect to amortize sec. 174(a) expense deductions over a 10-year period. On brief, petitioner argues that MMI was entitled to elect 10-year amortization under sec. 58(i).↩
3. The 7.1-percent royalty to be paid to MMJV was allocated among its partners as follows: ↩
Partner
Amt. Contributed
Royalty Percentage
MMI
$   600,000
1.00
MMII
90,000
.15
MMII
810,000
1.50
MMIV
630,000
4.45
Total
2,130,000
7.10
4. Sec. 174(a)(1) generally provides that: A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction.↩
5. Sec. 58(i), as in effect for 1984 and 1985, provided: (i) Optional 10-Year Writeoff of Certain Tax Preferences. -- (1) In general. -- For purposes of this title, in the case of an individual, any qualified expenditure to which an election under this paragraph applies shall be allowed as a deduction ratably over the 10-year period beginning with the taxable year in which such expenditure was made. (2) Qualified expenditure. -- For purposes of this subsection, the term "qualified expenditure" means any amount which, but for an election under this subsection, would have been allowable as a deduction for the taxable year in which paid or incurred under -- * * * (B) section 174(a) (relating to research and experimental expenditures) * * *
Sec. 58(i) was repealed by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 701(a), 100 Stat. 2320, 2335, and recodified as sec. 59(e)↩.
6. Under sec. 174(b), the expenditure may be amortized over 60 months.↩