**Louis H. DIAMOND, Madelene Diamond, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

**No. 89–2817.**

United States Court of Appeals, Fourth Circuit.

Argued May 8, 1990.

Decided April 11, 1991.

As Amended May 6, 1991.

Gerald William Heller, argued (Samuel P. Kastner, Robin K. Gold, on brief), Laxalt, Washington, Perito & Dubuc, Washington D.C., for petitioners-appellants.

Robert Leslie Baker, argued (Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen, Robert S. Pomerance, Peter K. Scott, Acting Chief Counsel, I.R.S., on brief), Tax Div., U.S. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before PHILLIPS, Circuit Judge, SMITH, Senior United States Circuit Judge for the Federal Circuit sitting by designation, and YOUNG, Senior U.S. District Judge for the District of Maryland, sitting by designation.

EDWARD S. SMITH, Senior Circuit Judge:

Louis H. Diamond and Madelene Diamond appeal the decision of the United States Tax Court, entered July 20, 1989, pursuant to its opinion filed February 23, 1989. The Tax Court found taxpayers liable for deficiencies in income tax for the tax years 1981 and 1982 in the respective amounts $20,943.09 and $7,922.00, with interest.[1]

Taxpayers[2] appeal only one issue decided by the trial court: Whether deductions of research and development expenditures by a partnership meet the requirements of

---

1. *Diamond v. Commissioner,* 92 T.C. 423 (1989).

2. All references in this opinion to taxpayer or appellant are to Louis H. Diamond. Madelene Diamond is a party because of the joint income tax returns filed for the tax years involved.

section 174(a)(1) of the Internal Revenue Code of 1954.[3] We affirm.

Appellant's standing arises from his direct ownership of a limited partnership interest in a Maryland limited partnership which, for the purposes of this summary, was the vehicle for his indirect ownership of a limited partnership interest in an Israeli limited partnership. Under established "flow-through" principles of partnership income tax law, partnerships generally are not taxable entities in themselves. Therefore, income and deductions generated by partnerships are generally given tax effect in the returns of the individual partners. In this case, the "flow-through" item was taxpayer's distributive share of partnership net operating losses resulting principally from research and experimental expenditures.

The question to be answered in order to resolve the issue here is whether Elco R & D Associates, the Israeli limited partnership, was engaged during the tax years 1981 and 1982 in a trade or business within the meaning and intent of section 174(a)(1). In a well-reasoned opinion, the Tax Court made findings of facts upon which it concluded that neither partnership was so engaged. We agree with the trial court. The deduction, not qualifying as to the partnership, is therefore unavailable to the partners.

A comprehensive account of the complex facts of the case may be found by reference to the opinion of the trial court. Following are the facts pertinent to this appeal.

Elco R & D Associates (the project partnership), a joint venture in the form of an Israeli limited partnership, was formed for the project of developing and exploiting a robot arc welder and/or an optical seam follower for use in the automotive manufacturing industry (the project). The project partnership had one general partner, with a 5.88% ownership interest; and one limited partner, with a 94.12% ownership interest.

The sole limited partner of the project partnership was itself a partnership formed under Maryland law and known as Robotics Development Associates Limited Partnership (Robotics). Appellant's direct interest as a partner was through his limited partnership interest in Robotics.[4]

The sole general partner of the project partnership was Elco Ltd. (Elco), a publicly held corporation organized under Israeli law. A subsidiary of Elco, also an Israeli corporation, was Elco Robotics Ltd. (Elco subsidiary).

For purposes of simplicity, we restate operational facts found by the trial court. The project was undertaken by the project partnership pursuant to an agreement (Project Partnership Agreement), to which Robotics and Elco were parties. Essentially, Robotics provided much of the necessary capital utilized by the project partnership, although contributions by Elco and loans from the Israeli government were involved. Technology and research were furnished to the project partnership by Elco. Other functions such as manufacturing, production, marketing and management were essentially subcontracted to Elco or to Elco subsidiary.

The *bona fides* of the purposes and operation of the project, the relevant expenditures, and the competency of those involved are not in issue. The question arises from additional rights and duties conferred upon Elco or Elco subsidiary by Paragraph 5 of the Project Partnership Agreement:

5. *Obligations and Undertakings by [Elco]*

---

3. 26 U.S.C. § 174(a)(1) (1982): "A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction." *Id.*

4. Robotics had 3 general partners with a combined ownership interest of 1%, and 26 limited partnership units with a combined ownership of 99%. These 26 units were purchased by 38 investors in consideration for cash and for undertaking obligations to furnish additional capital, as fully set out in the trial court's opinion. Appellant was one of the 38 owners of the 26 limited partnership interests.

(a) *Research and Development; Exploitation.*

   *    *    *    *    *    *

(ii) [ELCO] agrees that (1) the actual research and development work on the Project shall be carried out by [Elco], at its premises and using primarily its employees and equipment, (2) it will provide, within the framework of the budget of the Project approved by the Chief Scientist, such personnel and facilities and devote such time to the Project as shall be required for the diligent pursuit of the Project Partnership's objectives, (3) the undertakings of [Elco] under this Agreement shall be performed or otherwise carried out under the general supervision and management of Mr. Gideon Gelman or a suitable successor selected by [Elco]; provided, however, that [Elco] may employ a third party (including, without limitation, an affiliate) as sub-contractor to carry out all or part of the research and development work on the Project or may consult with any third party (including, without limitation, an affiliate) in connection with the research and development work on the Project if (y) such employment of a sub-contractor or consultation shall not violate the [Chief Scientist] Agreement and (z) such employment of a sub-contractor or consultation shall not in any manner relieve [Elco] of its obligations under this Agreement in respect of the research and development work on the Project.

(iii) In the event that [Elco] determines that the manufacturing, production and/or marketing of any product resulting from the research and development work of the Project should be carried out by [Elco] and/or any one or more of its affiliates, (1) such manufacturing, production and/or marketing activity shall be carried out exclusively by it and/or any such affiliate in the capacity of an exclusive and irrevocable licensee (such license to survive the termination of the Project Partnership), * * * and not in [Elco's] capacity as a general partner of the Project Partnership, * * *. Notwithstanding the foregoing provisions * * * it is hereby agreed that [Elco] or such affiliate shall have no obligation to carry out any manufacturing, production and/or marketing itself in the event that [Elco] shall determine that such manufacturing, production and/or marketing should be carried out wholly or partly by any third party or parties * * *.

The Tax Court found that the project partnership and Robotics could not reasonably be expected to carry on the trade or business of exploiting the robot project in light of the rights conferred upon Elco by these provisions of the Project Partnership Agreement. Thus, it concluded, as the facts existed in 1981 and 1982, there would never be a trade or business, conducted by a partnership in which appellant had an interest, *in connection with* which such research or experimental expenditures were or would be made.

Under early interpretations of section 174(a)(1), research or experimental expenses such as those involved here were held to be not deductible unless they were incurred or paid after the actual commencement of business. The Supreme Court departed from this approach in its decision and opinion in *Snow v. Commissioner*, 416 U.S. 500, 94 S.Ct. 1876, 40 L.Ed.2d 336 (1974). Accordingly, since the decision in *Snow*, a taxpayer need not be *engaged* in a trade or business at the time of expenditure in order to qualify for a deduction under section 174(a)(1), because that provision was intended to encourage high technology start-up ventures. However, for research or experimental expenses to be deductible under section 174, the requirement "in connection with his trade or business" must be satisfied; that is the badge of difference between section 174 and other "doing business" provisions of the Code. This phrase has been held to mean that "[T]he taxpayer must still be engaged in a trade or business *at some time....*" *Green v. Commissioner*, 83 T.C. 667, 686 (1984) (emphasis in original).

In *Cleveland v. Commissioner*, 297 F.2d 169 (4th Cir.1961), this court held that such deductions were available during the "start-up" period where it was determined

that (1) the taxpayer and the inventor were engaged in a joint venture, in which (2) they were both active participants, (3) both were to jointly own the product developed, and (4) they would divide the profits equally. That decision received approval in *Snow*, 416 U.S. 500, 504, 94 S.Ct. 1876, 1878-79.

Appellant argues that, based on *Snow* and *Cleveland* specifically, the question is not foreclosed; that the partnerships in which appellant has an interest were not precluded by the law of contracts or the laws of economics from engaging in a trade or business.

Appellant's reliance on *Snow* and on *Cleveland* is misplaced. The economic expectation that existed in *Cleveland* has no parallel in this case. The question is not whether it is possible in principle, or by further contract, for these partnerships to engage in a trade or business, but whether, in reality, the project partnership or Robotics possessed the capability in the years before the court to enter into a new trade or business in connection with the proposed robot and/or the optical seam finder. The answer to the question of reality must be found in *economic* reality, which is revealed more by the direction of the money than by the complexion of the principle. In these circumstances, the "money" test and the "economic reality" test are merely two labels for the same test.[5]

The Tax Court has not "irrebutably presumed" that Elco's exercise of its option will occur in any event. Similarly, the trial court did not find it necessary to determine whether section 5(a)(iii) is the equivalent of a license rather than an option. The Tax Court was not unmindful of the critical activities of highly competent individuals connected with each, and in some instances more than one, of the entities involved here. The trial judge has followed the sound reasoning set forth in a similar case [6] to demonstrate that appellant's argument founders on economic reality; that if a money-making business should materialize, there exists no reasonable expectation that Elco will permit it to be exploited by one of the partnerships and not by Elco:

> Elco was not required to furnish additional consideration to the Project Partnership or Robotics, and could exercise the option granted by section 5(a)(iii) at any time. In the exercise of sound business judgment, Elco would surely exercise its right under section 5(a)(iii) if the project was anticipated to be profitable enough to justify incurring the costs of manufacturing and marketing the robot. Elco would already have in place part of the infrastructure necessary for it to pursue those activities, since Elco was itself a high technology firm, and it and/or its subsidiary performed the research and development work. However, should the robot appear to be unprofitable, Elco would decline to exercise its rights under section 5(a)(iii), leaving the project partnership or Robotics with the right to develop an asset whose costs would not appear to justify additional investment. Absent Elco's participation, neither of these parties would have the necessary infrastructure to undertake to manufacture the robot, although Robotics' general partners, Yaakov and Goldman, had the expertise and contacts necessary to secure the robot's manufacturing and marketing through other channels if it could be done profitably.

92 T.C. 423, 440-41.

Using this reasoning, the Tax Court analyzed the substance of the transaction conducted within this intricate organizational

---

5. An appellee once took his full allotted time to make an oral argument which he capped with a fervent statement that it was not the money, but the principle involved. Appellate counsel sat down after making a rebuttal of one sentence: "In forty years at the bar, it has been my experience that when they argue that it is the principle and not the money—it's always the money." The observation, although perhaps not statistically precise, is more than merely anecdotal.

6. *Spellman v. Commissioner*, 845 F.2d 148 (7th Cir.1988). It is implicit in the language of the Seventh Circuit opinion that the trade or business requirement must be satisfied *at some time*, when that court relates the expenditures as being "in connection with a business that has not *yet* gotten off the ground." *Id.* at 149 (emphasis added).

arrangement. The court found that Elco, the independent corporation, had complete control over the research and development phase of the Project through its subcontracts with the Project Partnership pursuant to section 5(a)(iii) of the Project Partnership Agreement. In addition, the court found: (1) section 5(a)(iii) extended such control to the production and marketing of the product; (2) Elco left no room for Robotics, the partnership of which appellant was a partner, or for any other party to have a say in the affairs of the Project; and (3) such an entity, with no control over activities in which it invests, is more properly classified as an investor and cannot be engaged in a trade or business in connection with those activities.

Under the applicable standard of review, it cannot be said that the findings of the Tax Court are clearly erroneous.

## CONCLUSION

The income tax provisions of the Internal Revenue Code may be likened to players standing in the rows of a gauntlet, which all economic increases and decreases must successfully pass before they earn such badges as "exclusion," "exemption," "allowance," "accelerated," "deferred," "deduction," etc. The economic decreases represented by the expenditures made here may successfully have been run past all other provisions of the Code, but they have been unable realistically to meet the requirements of the phrase "in connection with a trade or business," and they have been struck by section 174(a)(1).

The trial court has correctly applied the law. Its findings of facts are not clearly erroneous. The decision of the United States Tax Court is affirmed.

AFFIRMED.