DOUBLE BAR CHAIN CO., LTD., SELWAY TECHNOLOGY INC., TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Double Bar Chain Co. v. Commissioner
Docket No. 39308-87
United States Tax Court
T.C. Memo 1991-572; 1991 Tax Ct. Memo LEXIS 620; 62 T.C.M. (CCH) 1276; T.C.M. (RIA) 91572; November 25, 1991, Filed *620 Decisions will be entered under Rule 155. James A. Ririe, for the petitioner. Paul K. Voelker, for the respondent. SWIFT, Judge. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent, pursuant to section 6223, [1] mailed a notice of final partnership administrative adjustment (FPAA) in regard to Double Bar Chain Co., Ltd. (Double Bar), for 1983. The primary issue for decision is whether $ 479,500 in research and experimental expenditures were incurred by Double Bar in connection with a trade or business. FINDINGS OF FACT Some of the facts have been stipulated and are so found. In December of 1983, Double Bar was formed in Idaho as a limited partnership by Max Ririe (Max), his brother Wayne Ririe, and David Van Wagoner (Van Wagoner). Max is an inventor with a background in agricultural engineering. *621 Max has a number of patented inventions relating to the farming industry, and his particular area of expertise pertains to potato harvesting equipment. Petitioner Selway Technology, Inc. (Selway), is the general partner and tax matters partner of Double Bar. Selway's principal place of business was in Las Vegas, Nevada, when the petition in this case was filed. The sole shareholder of Selway is Van Wagoner, who has a background in marketing and only limited experience in the potato industry. [2]
In 1983, Max became interested in improving the traditional hook chain used on potato harvesting equipment. The hook chain is the part of potato harvesting equipment which digs potatoes out of the ground. The traditional hook chain used *622 on potato harvesting equipment breaks easily and is expensive to replace. Max believed that potato harvesting equipment would be improved by replacing the hook chain with either a steel double side bar chain or a belted digger chain and by adding a belted chain roller. Double Bar was to be the partnership vehicle through which funds were to be raised to finance the development and testing of such technology. In 1983, Double Bar allegedly agreed to pay James Ririe's law firm, Ririe, Jenkins, Hall & McNamara, $ 20,000 for legal fees associated with organizing Double Bar as an Idaho limited partnership. In 1983, however, Double Bar paid the law firm only $ 7,483, and no written agreement is in evidence establishing Double Bar's obligation to pay the $ 20,000 in legal fees. Individuals interested in investing in Double Bar were given a private offering memorandum and/or a document entitled "Introduction to Investment Offering." Both documents described Double Bar's business as the research and development of a steel double side bar chain and peripheral equipment to be used in potato harvesting. The documents described the risks associated with an investment in Double Bar and emphasized *623 the potential tax benefits. Double Bar's private offering memorandum explained that -- [Double Bar] intends to contract with others to complete the research and development and to manufacture, produce, market and sell the invention(s). Accordingly, none of the essential activities relating to the invention(s) will be conducted directly by the partnership or its general partners.
The private offering memorandum also indicated that Double Bar, in exchange for royalty payments, intended to give to Agparts Manufacturing, Inc. (Agparts), a license to manufacture, market, and sell any new technology developed. Agparts was wholly owned by Max. The private offering memorandum suggested that any royalty income received by Double Bar under the licensing agreement would be treated, for Federal income tax purposes, as long-term capital gain. Under the subscription agreements executed by the investors, the purchase price of one limited partnership unit in Double Bar was $ 5,000, reflected by a $ 2,000 cash downpayment and a $ 3,000 deferred debt obligation. A total of 99 partnership units were sold to investors. Total cash downpayments of $ 105,000 were received by Double Bar *624 from investors. The cumulative total of the investors' deferred debt obligations to Double Bar was $ 390,000, and the cumulative total purchase price reflected by the 99 subscription agreements was $ 495,000. The investors signed 20-year promissory notes in favor of Double Bar with respect to their deferred debt obligations, reflecting an annual interest rate of 10 percent simple interest, with the first payments due on January 15, 1984. The investors were not directly involved in the research and development activities of the partnership, and they had no knowledge of or experience with potato harvesting equipment. On or about December 30, 1983, Van Wagoner, on behalf of Selway and Double Bar, entered into a research and development agreement with Ririe & Associates Engineering, Inc. (Ririe & Associates), of which Max was the sole shareholder. Under this research agreement, Ririe & Associates agreed to undertake, on behalf of Double Bar, a research program to develop a double side bar chain or belted digger chain combined with a belted chain roller, and Ririe & Associates agreed that the only expenses to be incurred would be those expenses qualifying under section 174. Under *625 the agreement, Ririe & Associates was to determine when and how the research was to be conducted. Under the agreement, Ririe & Associates agreed to assign to Double Bar the rights to all technology developed, and Ririe & Associates agreed to submit quarterly reports to Double Bar summarizing the status and progress of the research. In return for the above-described research, Double Bar promised to pay Ririe & Associates $ 480,000, reflected by a $ 180,000 cash downpayment and a $ 300,000 deferred debt obligation. The cash downpayment was payable by Double Bar on execution of the agreement and annual deferred payments of at least $ 32,034 were to start on January 31, 1985. As collateral, Double Bar agreed to have all of the investors execute assumption agreements, under which the investors would be liable directly to Ririe & Associates for the deferred amounts due under their subscription agreements if Double Bar failed to make the payments it owed to Ririe & Associates. During December of 1983 and January of 1984, Double Bar allegedly made payments totaling $ 98,500 to Ririe & Associates. Double Bar paid $ 52,500 in cash, and it is alleged that James Ririe, Max Ririe's brother *626 and attorney for Selway, transferred a building worth $ 46,000 to Ririe & Associates as a further payment on behalf of Double Bar. The record, however, does not contain any evidence of a deed transferring the building to Ririe & Associates. Ririe & Associates failed to submit any written quarterly reports to Double Bar. Further, Ririe & Associates never formally assigned the rights to any new technology to Double Bar as required by the research agreement. Sometime in 1984, after Ririe & Associates terminated one phase of the research involving the belted digger chain and after an investor rescinded its subscription agreement, Double Bar and Ririe & Associates apparently orally amended the research agreement. Under the amended research agreement, Double Bar's original total payment obligation to Ririe & Associates of $ 480,000 was reduced to $ 247,500.
In 1984, Ririe & Associates completed the design for the manufacture of a double side bar chain and a belted chain roller. On June 8, 1986, in a written amendment to the research agreement, Double Bar and Ririe & Associates agreed to defer Double Bar's payments due to Ririe & Associates until such time as the agricultural economy *627 recovered sufficiently to allow for successful marketing of a double side bar chain and a belted chain roller. Max, acting on behalf of Ririe & Associates, was to have full discretion to determine when the payments would be due. As of the date of trial, Double Bar had not paid any of the deferred payments due under the research agreement, and Ririe & Associates had not requested that the investors pay the amounts due under their subscription agreements. In 1989, Agparts began manufacturing and selling the belted chain roller using the design developed by Ririe & Associates. Agparts reported gross sales of $ 227,512 for 1989 and paid royalties of 8.5 percent thereof to Double Bar. The record does not indicate whether or when Double Bar and Agparts entered into a licensing contract for the double side bar chain and belted chain roller. Manufacture of the double side bar chain was scheduled to commence in 1990. During and after the completion of the research agreement, Selway only engaged in ministerial activities with respect to Double Bar. Selway's activities consisted of the keeping of records, the writing of checks for organizational and research expenditures, and the filing *628 of a partnership information tax return. Sometime during 1989, Ririe, Jenkins, Hall & McNamara forgave Double Bar the remaining $ 12,517 relating to the legal costs of organizing Double Bar. On its 1983 partnership information tax return, Double Bar used the accural method of accounting and deducted $ 479,500 in research and experimental expenditures relating to the double side bar chain and the belted chain roller, [3] and Double Bar deducted $ 4,000 for partnership organizational expenditures ($ 20,000 amortized over 60 months). On audit, respondent determined that Double Bar was not entitled to deduct the research and experimental expenditures because, among other reasons, the expenditures were not incurred in connection with a trade or business within the meaning of section 174. Respondent also determined that Double Bar was not entitled to amortize the $ 20,000 in alleged legal *629 fees as organizational expenditures under section 709(b). OPINION Section 174(a)(1) provides, as a general rule, that -- taxpayer[s] may treat research or experimental expenditures which are paid or incurred by [them] during the taxable year in connection with [their] trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction.
Section 174(a)(1) applies to expenditures paid or incurred by a taxpayer for research or experimentation undertaken directly by a taxpayer and also to expenditures paid or incurred by a taxpayer for research or experimentation carried on by another person or entity on the taxpayer's behalf. Sec. 1.174-2(a)(2), Income Tax Regs.
In order to be entitled to deductions for research and experimental expenditures, a taxpayer need not currently produce or sell any product, and a taxpayer need not be engaged currently in a trade or business. Snow v. Commissioner, 416 U.S. 500, 503-504, 40 L. Ed. 2d 336, 94 S. Ct. 1876 (1974). It is established, however, that -- For section 174 to apply, the taxpayer must still be engaged in a trade or business at some time, and * * * [the Court] *630 must still determine, through an examination of the facts of each case, whether the taxpayer's activities in connection with a product are sufficiently substantial and regular to constitute a trade or business for purposes of such section. [Green v. Commissioner, 83 T.C. 667, 686-687 (1984); fn. ref. and citations omitted.]
Under section 174, a taxpayer must be more than a mere investor to be entitled to deductions for research and experimental expenditures. Green v. Commissioner, supra at 688. Consequently, courts have examined claimed research and experimental expenditures to determine those that are legitimate and those that are merely designed to shelter income of passive investors. Spellman v. Commissioner, 845 F.2d 148, 151 (7th Cir. 1988), affg. a Memorandum Opinion of this Court; Diamond v. Commissioner, 92 T.C. 423 (1989), affd. 930 F.2d 372 (4th Cir. 1991); Levin v. Commissioner, 87 T.C. 698 (1986), affd. 832 F.2d 403 (7th Cir. 1987); Scientific Measurement Systems I, Ltd. v. Commissioner, T.C. Memo 1991-69. *631 The controlling inquiry, where a partnership is claiming deductions under section 174, is whether, during the years in issue, there was any realistic prospect that the partnership would enter a trade or business involving the technology being developed. Diamond v. Commissioner, supra at 439. Thus, a mere legal entitlement to enter a trade or business is insufficient. Instead, "The legal entitlement must be backed by a probability of the firm's going into business." Levin v. Commissioner, 832 F.2d at 407. To determine if there is a realistic prospect of a partnership entering a trade or business with respect to new technology, all of the surrounding facts and circumstances are relevant, including the intentions of the parties to the agreement, the amount of capitalization retained by the partnership during the research and development contract period, the exercise of control by the partnership over the person or organization doing the research, the business activities of the partnership during the years in question, and the experience of the partners. Diamond v. Commissioner, supra; Levin v. Commissioner, *632 Supra; Scientific Measurement Systems I, Ltd. v. Commissioner, supra. If there is no realistic prospect that the partnership will enter a trade or business with respect to the technology, the partnership will be treated as a passive investor, not eligible for deductions under section 174. In Diamond v. Commissioner, supra, at the time the partnership executed a research and development agreement, the partnership granted an option to the research contractor to acquire an exclusive license to the new technology at some future time. Even though the partnership had not given up all of its rights to the technology at the time it executed the research agreement, we found that no realistic prospect existed that the partnership would ever enter any trade or business relating to the technology. Diamond v. Commissioner, supra at 429. Our analysis focused on the intentions of the partnership and of the research contractor and on the likelihood that the research contractor would exercise the option if the technology turned out to have any significant value. Diamond v. Commissioner, supra at 441. *633 In Green v. Commissioner, supra, a partnership entered into a research and development agreement under which it divested itself of all ownership rights in the technology to be produced under the agreement. We concluded that the research and development expenditures were not incurred in connection with a trade or business because once the partnership gave up all of its rights under the contract, it was unable to enter into a trade or business with respect to the technology. Green v. Commissioner, supra at 691. In the instant case, petitioner acknowledges that Double Bar had an understanding with Agparts regarding a future license of the technology. Petitioner asserts, however, that because no written agreement existed between Double Bar and Agparts, Double Bar itself could have gone into the trade or business of manufacturing, marketing, and selling the technology. Thus, petitioner contends that Double Bar is entitled to deduct the expenditures under section 174. Respondent maintains that the deductions under section 174 should be disallowed, citing Double Bar's stated intent never to be actively involved in either the research *634 and development of the technology or in the selling and manufacturing thereof. Although Double Bar may have been legally entitled to enter the trade or business of manufacturing and marketing technology developed by Ririe & Associates, we find that Double Bar never intended to do so. Double Bar expended essentially all of the funds received from investors to pay Ririe & Associates, and it retained only limited capital to fund any business activities involving the technology. Double Bar's private offering memorandum explicitly stated that none of the essential activities relating to the technology developed would be conducted directly by Double Bar. Agparts, a corporation owned by Max, already had been chosen to manufacture, market, and sell the technology. The partners of Double Bar retained essentially no control over the research activities of Ririe & Associates concerning the technology. Ririe & Associates made all of the business decisions regarding when and how the research was to be accomplished. The only restriction on Ririe & Associates was that all expenditures must qualify for deduction under section 174. Ririe & Associates did not comply with the requirement that *635 it provide Double Bar with quarterly reports. Selway, the general partner and tax matters partner of Double Bar, engaged only in ministerial activities during and after completion of the research. Selway kept records, wrote checks for organizational and research expenditures, and filed the partnership information tax return. Those activities alone do not constitute business activities; rather, they resemble the activities of one maintaining investments. Finally, the investors in Double Bar had little or no experience with the technology of potato harvesting. Although Van Wagoner had a marketing background, he had limited experience in the farming industry. The focus of the private offering memorandum on tax benefits further corroborates our conclusion herein. With regard to the amortization of the $ 20,000 in alleged legal or organizational expenditures, section 709(b) provides that a partnership may elect to amortize organizational expenditures over a 60-month period, starting with the month in which the partnership begins its partnership activities. The only expenditures that a partnership may amortize under this section are those that are incident to the creation of the *636 partnership, that are chargeable to the capital account, and that are of a character which, if expended incident to the creation of a partnership having an ascertainable life, would be amortized over such life. Under section 709(b) a partnership is not required to be in a trade or business to be able to deduct organizational expenditures. Section 709(b) requires only that the partnership, "start the business operation for which it was organized." Sec. 1.709-2(c), Income Tax Regs; Aboussie v. United States, 779 F.2d 424, 430 (8th Cir. 1985); Diamond v. Commissioner, supra at 446. In the instant case, Double Bar entered into the research agreement on December 30, 1983, and it made several payments to Ririe & Associates prior to 1984. Although we have held that Double Bar did not enter and did not have any reasonable prospect of entering a trade or business involving potato harvesting technology, we find that Double Bar did begin the activity for which it was organized during 1983, namely investing in Ririe & Associates. Petitioner asserts that Double Bar incurred $ 20,000 in organizational expenditures in 1983. Petitioner, however, bears *637 the burden of proof to show that Double Bar incurred more than the $ 7,483 in organizational expenditures that were actually paid. Welch v. Helvering, 290 U.S. 111, 115, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). We conclude that Double Bar may deduct as organizational expenditures under section 709 only $ 1,497 in 1983, namely $ 7,483 amortized over 60 months. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. There is some indication in the record that Van Wagoner, in his individual capacity, replaced Selway as general partner of Double Bar. However, no formal substitution was made as required by the limited partnership agreement, and we treat Selway as the general partner of Double Bar.↩
3. The $ 500 difference between the deduction claimed of $ 479,500 and the agreed price of $ 480,000 is not explained in the record.↩