T.C. Memo. 2001-10


UNITED STATES TAX COURT


I-TECH R&D LIMITED PARTNERSHIP, NATHAN LEWIN, A PARTNER OTHER
THAN THE TAX MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 20561-97.                  Filed January 22, 2001.


<u>Nathan Lewin</u>, pro se.

<u>Judith Cohen</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


RUWE, <u>Judge</u>:  Respondent issued a notice of final
partnership administrative adjustment letter (FPAA) for the years
1984, 1985, 1986, and 1987 to I-Tech R&D Limited Partnership (I-
Tech).  Nathan Lewin (petitioner), a partner other than the tax
matters partner, filed a petition for readjustment of partnership

items under Code section 6226.[1]  After concessions,[2] the issues

for decision are:  (1) Whether I-Tech is entitled to deduct

research or experimental expenses of $2,591,225, $2,834,032, and

$1,497,317 under section 174 in its tax years 1984 through 1986,

respectively; and (2) whether I-Tech is precluded from deducting

guaranteed payments of $79,867, $179,501, and $91,221 under

sections 162 and 707(c) in its tax years 1984 through 1986,

respectively.[3]

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]The amounts claimed by I-Tech on its tax returns differ from the amounts disallowed by respondent in the notice of final partnership administrative adjustment (FPAA).  The amounts disallowed in the FPAA are consistent with respondent's settlement position in this case as entered into with respect to some limited partners.  Respondent, for purposes of uniformity, adhered to this position in the FPAA.  Consequently, the amounts disallowed for research or experimental deductions, guaranteed payments, and management and overhead expenses are less than the amounts claimed on the partnership tax returns.

A "no change" agreement accepting the partnership's return as originally filed for the year 1987 was made in conjunction with I-Tech's consent to adjustments on Forms 870-P(AD), Settlement Agreement for Partnership Adjustments, for the years 1984, 1985, and 1986.

[3]I-Tech also deducted management and overhead expenses of $87,489 in 1984, $279,980 in 1985, and $217,460 in 1986. Respondent determined that these expenses had to be capitalized. Respondent determined that I-Tech's management and overhead deductions for 1984 would be allowed over a 36-month period, the 1985 deductions would be allowed over a 24-month period, and the 1986 deductions would be increased for amortization additions from capitalized costs in 1984 and 1985.  Since petitioner did
(continued...)

## FINDINGS OF FACT[4]

Some of the facts have been stipulated and are so found. The stipulation of facts, second stipulation of facts, and the attached exhibits are incorporated herein by this reference.

I-Tech was organized as a Maryland limited partnership in 1984 with three general partners: (1) Professor Itzhak Yaakov,[5] (2) Capital Corp. of Washington (Capital),[6] and (3) Lloyd Levin. Capital[7] is owned by Robert Slavitt.

Mr. Yaakov served in the Israel Defense Forces (IDF) for

---

[3](...continued)
not address this issue in either his original or reply briefs, we consider it to have been conceded. See Remuzzi v. Commissioner, T.C. Memo. 1988-8, affd. 867 F.2d 609 (4th Cir. 1989).

[4]Petitioner has ignored Rule 151(e)(3), which provides, in part:

> In an answering or reply brief, the party shall set forth any objections, together with the reasons therefor, to any proposed findings of any other party, showing the numbers of the statements to which the objections are directed; in addition, the party may set forth alternative proposed findings of fact.

Under the circumstances, we have assumed that petitioner does not object to respondent's proposed findings of fact except to the extent that petitioner's statements on brief are clearly inconsistent therewith, in which event, we have resolved the inconsistencies based on our understanding of the record as a whole. See Gleave v. Commissioner, T.C. Memo. 1997-276, n.3; see also Estate of Jung v. Commissioner, 101 T.C. 412, 413 n.2 (1993).

[5]The advisory general partner.

[6]The managing general partner.

[7]Capital is a District of Columbia corporation.

approximately 26 years. Prior to his retirement from the IDF in 1974, Mr. Yaakov served as chief of research and development.

Mr. Yaakov met with Mr. Slavitt, an investment banker, in June 1984. Mr. Yaakov and Mr. Slavitt decided to form I-Tech as a limited partnership to fund research projects of four startup Israeli companies that were previously funded by Advanced Technology Associates, L.P. (ATA), as well as a fifth Israeli company.

Pursuant to a Confidential Private Placement Memorandum (PPM) dated August 6, 1984, 68 units in the limited partnership were offered for sale to investors. The limited partnership interests were offered in units of $100,000 each.[8]

In Mr. Slavitt's promotional letter to prospective investors, he stated, in part:

> I-Tech R&D Limited Partnership will provide the funding for research and development of five separate R&D projects which will be included in our limited partnership.
>
> *     *     *     *     *     *     *
>
> The Limited Partners's cash investment will be spread over four calendar years and will produce the following approximate tax losses per $100,000 unit:

|      | Cash Invested | Tax Loss |
| --- | --- | --- |
| 1984 | $28,200 | $64,860 |
| 1985 | 39,726 | 80,103 |
| 1986 | 26,180 | 53,695 |
| 1987 | 5,894 | 11,906 |

---

[8]Petitioner purchased a one-half share for $50,000.

When R&D activities are completed and marketing commenced, the partnership will receive royalties based upon gross sales.  In addition, we will have the option to convert these royalties to equity in the companies at a later date.

I feel that by diversifying our investment in five separate companies, in three exciting areas of high technology where Israel has shown definite expertise, the potential for success is great.

Funds for the limited partnership were raised from various limited partners.  ATA was a limited partner in the I-Tech partnership.  The limited partnership closed in December 1984.

I-Tech entered into separate agreements with five Israeli research and development companies (R&D companies).  The R&D companies conducted research and development in computer robotics and related fields (R&D projects).  The R&D companies that I-Tech entered into agreements with are as follows:

1.   Oshap Technologies, Ltd. and its affiliates; (Oshap);[9]

2.   Efrat Future Technology, Ltd. (Efrat);[10]

3.   AiTech Systems, Ltd. (AiTech);[11]

---

[9]Oshap's research project concerned robots and robotic production lines--technology that would enable a manufacturer to simulate a production line on a computer screen.

[10]Efrat specialized in "digitizing voice" and created an early digital voice recording and retrieval system.

[11]AiTech was developing a line of "rugged" computer systems specifically designed to operate under severe environmental conditions.

4.   Hal Robotics, Ltd. (Hal Robotics);[12] and

5.   Cycon, Ltd. (Cycon)[13]

The four R&D companies previously funded by ATA are:  Efrat, AiTech, Hal Robotics, and Cycon.[14]  The ATA funds were derived from capital contributions by ATA's partners and loans from the Office of Chief Scientist of the Ministry of Industry and Trade of the State of Israel (Chief Scientist).  Cycon was the only R&D company for which ATA did not receive a Chief Scientist loan.

The original contract between ATA and Efrat (ATA R&D agreement) contained a provision stating that Efrat was exclusively entitled to manage and control the research and development project.[15]  The ATA R&D agreement also provided that Efrat had the power to do whatever was necessary to exploit the research and development project.  The original ATA R&D agreements with Efrat, AiTech, Hal Robotics, and Cycon were amended to substitute I-Tech for ATA.

---

[12]Hal Robotics was developing an "automatic workshop"--a computer program that would enable an entire product to be produced by robots.

[13]Cycon was developing a computer and the necessary software to control a machine that would mill metal parts automatically.

[14]As of Sept. 1, 1984, ATA provided the following amounts to the R&D companies to fund R&D expenses: (1) Eftrat, $1,725,000; (2) AiTech, $310,000; (3) Hal Robotics, $490,000; and (4) Cycon, $100,000.  Cycon subsequently repaid the $100,000 to ATA.

[15]Petitioner did not provide copies of the original agreements between ATA and the other three R&D companies (AiTech, Hal Robotics, and Cycon).

On August 3, 1984, Robots & Software International, Inc. (RSI)[16] and I-Tech entered into a contract whereby RSI provided technical and other consulting services to I-Tech and the R&D companies.[17]  RSI agreed, in part, to provide the followings services:

(b)  Assist the R&D Companies in carrying out the R&D projects; * * *

     *     *     *     *     *     *     *

(d)  Advise the R&D companies and * * *[I-Tech] generally on matters relating to the execution and performance of the R&D agreements and the management of the R&D Companies;

     *     *     *     *     *     *     *

(g)  Promote contacts between the R&D Companies and individuals or institutions, in the United States, Israel, and elsewhere * * *;

(h)  * * *[M]onitor the financial condition and management of the R&D companies;

     *     *     *     *     *     *     *

(j)  Provide * * * technical assistance to the R&D Companies and * * *[I-Tech] as needed in connection with the R&D Projects.

The contract constituted the entire agreement between RSI and I-Tech.  The contract did not make either RSI or I-Tech the employee, agent, partner, or legal representative of the other

---

[16]RSI is a New York corporation.

[17]Mr. Yaakov had a controlling interest in Robots & Software International, Inc. (RSI).

for any purpose whatsoever. Both RSI and I-Tech acted as independent contractors.

On August 3, 1984, WorldTech Israel, Ltd. (WTI),[18] State National Investments, Inc. (WorldTech U.S.),[19] and I-Tech entered into a contract whereby WTI and WorldTech U.S. agreed to provide management, financial, and consulting services to I-Tech.[20]

WTI and WorldTech U.S. agreed, in part, to provide the followings services:

> (ii) Supervise the activities of the R&D Companies in carrying out the R&D Projects, and direct such work to the extent that * * *[I-Tech] is entitled to do so; * * *
>
>   *   *   *   *   *   *   *
>
> (v) Conduct negotiations on behalf of * * * [I-Tech] with the R&D Companies and other entities in connection with the R&D Projects.
>
>   *   *   *   *   *   *   *
>
> (vii) Assist * * * [I-Tech] and the R&D Companies in recruiting qualified personnel in Israel, the United States, and other countries.
>
>   *   *   *   *   *   *   *
>
> (ix) Locate parties that may be suitable for technical cooperation with the R&D Companies.
>
> (x) Report to * * * [I-Tech] on the activities of the R&D Companies on a regular basis * * *.

---

[18]An Israeli corporation.

[19]A Delaware corporation.

[20]Mr. Yaakov had a controlling interest in WTI and WorldTech U.S.

In connection with the R&D projects undertaken by the R&D companies, RSI agreed to assist WTI in providing services on behalf of I-Tech.

The contract constituted the entire agreement among WTI, WorldTech U.S., and I-Tech. The contract did not make any of the parties the employee, agent, partner, or legal representative of the other for any purpose whatsoever. Each party acted as an independent contractor.

Funding

The Israeli Government, through the Industrial Development Bank of Israel (IDB), provided loans with respect to each R&D project. These loans were limited to an amount equal to 54 percent of the total funds needed for each R&D project (primary loans).[21] I-Tech funded 36 percent of each R&D project using proceeds from the sale of limited partnership interests and a $1,585,000 commercial loan from the Israel General Bank, Ltd. (General Bank).[22] Each R&D company contributed the remaining 10

---

[21]The limited partners in I-Tech have not repaid any portion of their pro rata shares of the recourse loans that the Industrial Development Bank of Israel Limited made on behalf of the Chief Scientist of the Ministry and Trade in Israel in connection with the R&D projects.

[22]I-Tech repaid the recourse loan that the Israel General Bank, Ltd., made to I-Tech in connection with the R&D projects. The loan was repaid from the funds received by I-Tech from Efrat, AiTech, and Oshap when those R&D companies exercised their options. These transactions were noted on the partnership's tax

(continued...)

percent of the total budget from its own source of funds.

The primary loan through the IDB was made for the sole purpose of encouraging the conduct of the research and development in Israel. Each time I-Tech disbursed funds from the IDB loan to an R&D company, the R&D company was required, within 72 hours, to lend I-Tech 5.5 percent[23] of the amount so disbursed to that R&D company (secondary loan).[24]

In addition to funding the five R&D projects, I-Tech allocated $990,000 of the offering proceeds to a "blind pool" or "discretionary account" to be used at the discretion of Capital, the managing general partner, as additional funding for one or more of the R&D projects or other R&D projects. The blind pool of $990,000 was invested in two other R&D projects promoted by Mr. Slavitt.[25]

R&D Agreements

Under the terms of each R&D agreement, ATA granted I-Tech certain rights, title, and interest in and to the R&D companies' existing technology and technology to be developed in the R&D

---

[22](...continued)
returns.

[23]This was 5.55 percent in the case of Hal Robotics.

[24]I-Tech repaid the nonrecourse loans from the R&D companies to I-Tech. These loans were repaid from the funds received by I-Tech from Efrat, AiTech, and Oshap when those R&D companies exercised their options. These transactions were noted on the partnership's tax returns.

[25]Medical R&D Associates Limited Partnership and Israel Technology-5 Limited Partnership.

projects. I-Tech granted a nonexclusive license to the R&D companies to use the technology for the completion of each R&D company's project in return for certain fees and royalty payments. I-Tech also granted one or more nonexclusive licenses to the R&D companies for the commercial exploitation of new technology, patents (discoveries), and products in return for royalty payments.

With respect to Efrat, AiTech, Hal Robotics, and Cycon, the nonexclusive licensing periods for exploitation of the research and products began after the research had been successfully completed and the research had been reduced to practice (completion date). For these companies, the nonexclusive licensing periods were to run until specified levels of royalties had been received, or until either I-Tech exercised certain rights to acquire equity in Efrat, AiTech, Hal Robotics, and Cycon or, in the case of Efrat, AiTech, and Hal Robotics, until the R&D companies elected to acquire all I-Tech's rights, title, and interest to such technology in exchange for royalties and fees (buy-out option). Although Cycon did not have a buy-out option, RSI had an option to acquire the rights to market products using Cycon discoveries in the United States.

With respect to Oshap, the nonexclusive licensing period was to run for 6 months and 1 day after the completion date. During this time, I-Tech was to receive royalties from the commercial

exploitation.  At the end of the nonexclusive licensing period, I-Tech granted Oshap the buy-out option.

The exercise prices of the buy-out options held by Efrat, Hal Robotics, and AiTech, were based on I-Tech's investment.

I-Tech had options to acquire a 20-percent interest in Efrat, AiTech, Hal Robotics, and certain Oshap affiliates,[26] and a 10-percent interest in Cycon.

Project Restrictions

The Israeli Government and I-Tech entered into a multiannual industrial research agreement.[27]  The agreement contained the following clause:

> [I-Tech] undertakes to cause the manufacturing of the Product to be developed as a result of the Research Program to be carried out only in Israel.

I-Tech's contracts with each R&D company contained a prohibition against the manufacture of any product or partial product taking place outside of Israel without the express written consent of the Chief Scientist.  This restriction applied whether the products were manufactured or produced by I-Tech or by one of the R&D companies.  Additionally, each R&D agreement included a prohibition against any sublicensing agreements that

---

[26]Robcad, Robcad B, or other affiliates holding the rights to partnership patents and technology.

[27]Petitioner provided only the multiannual industrial research agreement regarding Efrat's research program.  The counterpart agreements for the other four R&D companies were not provided.

allowed the manufacturing of any discoveries outside of Israel without the express written consent of the Chief Scientist. There was no assurance that such consent would be considered or granted.

The Chief Scientist agreements also restricted I-Tech from transferring, selling, or using the know-how[28] derived from research and development <u>in Israel</u> without the Israeli Government's approval. There was no assurance that such consent would be considered or granted.

In the event that the R&D companies failed to commercialize the technology within 5 years from the termination of the project, the rights to the technology passed to the Israeli Government.

<u>Exploitation of Research</u>

1. <u>Efrat</u>

Efrat's marketing and manufacturing plans were stated in the PMM, in part, as follows:

> Efrat is negotiating with several PBX manufacturers and distributors regarding the marketing of Efrat's TAVOR system. Preliminary discussions have been held with several hotel chains and brokerage houses.

*   *   *   *   *   *   *

---

[28]Know-how includes any process, method, patent of invention and any trademark, blueprint, plan, written material, computer program, model and prototype which are a result or a part of the research program.

Efrat contemplates that all manufacturing of the VSF
[voice storage and forward system] will be done by
Efrat, with the exception of the printed circuit boards
and some subsystems (disc drives, cabinets and power
supplies).  The Company has represented that Tadiran
and certain other companies have expressed interest in
performing subcontracted manufacturing for Efrat.
Efrat would hire manufacturing staff to manufacture its
VSF systems. * * *

Efrat completed the technology it was developing.[29]  Within the required time period, Efrat exercised its option to acquire all right, title, and interest in the Efrat technology beginning 6 months and 1 day after the research was reduced to practice. Shortly after exercising its option, Efrat made a public offering of stock in the United States, and I-Tech exercised its option to exchange its royalty rights for an equity interest in Efrat.

2.   AiTech

AiTech's marketing and manufacturing plans were stated in the PPM, in part, as follows:

AiTech has executed an agreement with Intellimac, Inc.
of Rockville, Maryland.  This agreement provides for
transfer of know-how by Intellimac to AiTech in
exchange for marketing rights for AiTech products. * *
* In addition to transfer of know-how, Intellimac and
AiTech have agreed that Intellimac will have exclusive
marketing rights in the United States and Canada for
the product. * * *

          *     *     *     *     *     *     *

AiTech will do the work related to the packaging of its
products.  AiTech will purchase standard electronic
components, displays and keyboards manufactured by

---

[29]A new generation of voice storage and forward system to be called "TAVOR".

others and will subcontract the production of printed circuit cards to be incorporated in the products.

AiTech[30] completed the development of the technology it was developing in the AiTech R&D project.[31]  Within the required time period, AiTech exercised its option to acquire all right, title, and interest in the AiTech technology beginning 6 months and 1 day after the research was reduced to practice.  In December 1988, I-Tech exercised its option to exchange its right to receive royalties for a 20-percent equity interest in AiTech.

3.  Cycon

Cycon's marketing and manufacturing plans were stated in the PPM, in part, as follows:

> It is contemplated that Cycon will market the proposed system in Israel and abroad both directly to end users and through distributors.  Cycon has not developed any marketing forces.  Although Cycon presently lacks any service capability, it has verbal agreements and understandings with machine-tool manufacturers (OEM) and distributors in Europe, principally in Italy, Spain, Belgium, the United Kingdom, and Germany, as well as in the United States, according to which such companies will undertake to promote, sell, maintain and provide all after-sale services of Cycon products. Cycon contemplates that Cycon personnel would service the systems in Israel.  Cycon expects to enter into service agreements with foreign companies in order to arrange for servicing of the systems for non-Israel users.

---

[30]RSI, which was controlled by Mr. Yaakov, owned 29 percent of AiTech.

[31]A "ruggedized" computer system specifically designed to operate under severe environmental conditions.

Cycon contemplates that most manufacturing of the Cycon computer will be done by Cycon, except for a limited amount of work which will be subcontracted to other companies.

By the end of 1985, Mr. Slavitt and Mr. Yaakov[32] determined that the Cycon technology[33] should no longer be funded. Shortly after the Cycon R&D project was terminated, Cycon went into receivership.

Under the agreement with Cycon, I-Tech was the exclusive owner of any technology developed by the research. I-Tech sold its rights to the Cycon technology to NCT, a company that I-Tech had located with the assistance of WorldTech. Because NCT uses the technology developed in the Cycon R&D project in NCT's product-line development, I-Tech is entitled to receive royalty payments from NCT.

4. Hal Robotics

Hal Robotics' marketing and manufacturing plans were stated in the PPM, in part, as follows:

It is expected that sales will be made through the appointment of agents and distributors for the products in the target markets. Alternative distribution channels available to such products are original

---

[32]Mr. Yaakov had a 15-percent interest in Cycon plus an option to acquire an additional 15 percent. Also, RSI, which was controlled by Mr. Yaakov, owned 30 percent of Cycon and had an option to acquire an additional 10 percent.

[33]Development of a micro computer-based numerically controlled CAD/CAM (i.e., computer-aided design/computer-aided manufacturing) system to be used in the production of molds and dies on milling machines.

equipment manufacturers (OEM), which could offer
products manufactured by Hal Robotics as package deals
with their own products; also tool manufacturers or
manufacturers of industrial robots might be
distributors of Hal Robotics products.

* * * * * * *

Hal Robotics' work is in the competitive area of
CAD/CAM technology.  The Company believes, however,
that its focus on the manufacturing rather than the
design aspect addresses a potentially unfulfilled
market need and thereby provides a correspondingly
significant business opportunity. * * *

Hal Robotics intends to acquire certain of the hardware
components of its products from third parties. * * *

Based on their dissatisfaction with the Hal Robotics' R&D

project,[34] I-Tech's general partners ceased funding the Hal

Robotics' R&D project in 1986 and terminated the Hal Robotics'

R&D agreement.

5.   Oshap[35]

Oshap's marketing and manufacturing plans were stated in the

PPM, in part, as follows:

It is anticipated that the marketing of the products
developed by Oshap companies will be undertaken in
three ways:  (1) through subsidiaries to be established
in Europe and the United States; (2) through a chain of
system houses in the United States and Europe; and (3)
through original equipment manufacturer ("OEM")
contracts with other companies. * * *

---

[34]Development of a "flexible manufacturing system" under
which a computer would coordinate and direct the execution of
certain manufacturing processes.

[35]Mr. Yaakov had an indirect interest in an Oshap affiliate,
Roboticad.

\*     \*     \*     \*     \*     \*     \*

> It is anticipated that the Oshap Companies will produce the software to be integrated in the Robcad workstation, if the project is successful.  During the first stage of the R&D Project, it is not expected that Robcad would manufacture any hardware but would purchase it from third parties; Robcad would integrate such hardware with the software it develops.  At a later stage, Robcad may manufacture some special hardware and firmware, \* \* \*

After Oshap completed development of the technology it was developing in the Oshap R&D project,[36] two of Oshap's affiliates, Robcad and Robcad Computers, exercised their buy-out options to acquire all rights to the Oshap technology and made lump-sum payments to I-Tech of $150,000 and $1,100,000, respectively. After exercising their options, Robcad and Robcad Computers paid royalties to I-Tech.

Oshap successfully exploited the Oshap technology.  After extensive negotiations with Oshap and its affiliates, I-Tech was able to convert its option to exchange its royalty rights for equity interests in Robcad and Robcad Computers to an option to obtain an equity interest in Oshap, the parent corporation which made a public offering of its stock in the U.S. market.  I-Tech exercised its option to obtain an equity interest in Oshap and continues to own an interest in Oshap.

---

[36]Development of an advanced computer-aided engineering workstation for designers and implementers of automated manufacturing processes that use robots.

OPINION

## I.   Section 174 Deductions

Section 174 generally allows as a current deduction research or experimental expenditures which are paid or incurred by the taxpayer in connection with the operation of a trade or business. An entity, such as a partnership, may deduct these expenses even when the expenditures paid or incurred for research or experimentation are carried on in its behalf by another person or organization.  See sec. 1.174-2(a)(2), Income Tax Regs.  A partnership need not be engaged in a trade or business at the time of the expenditure in order to qualify for a deduction under section 174(a)(1).  See Snow v. Commissioner, 416 U.S. 500 (1974).  However, during the years in issue there must have been a "realistic prospect" that the entity in question would enter a "trade or business" involving the technology being developed. Diamond v. Commissioner, 92 T.C. 423, 439 (1989), affd. 930 F.2d 372 (4th Cir. 1991).  "If those prospects are not realistic, the expenditures cannot be 'in connection with' a business of the taxpayer" for the purpose of satisfying section 174.  Spellman v. Commissioner, 845 F.2d 148, 149 (7th Cir. 1988), affg. T.C. Memo. 1986-403.  Whether activities in connection with a product are sufficiently substantial and regular to constitute a trade or business for purposes of section 174 is a factual determination. See Green v. Commissioner, 83 T.C. 667, 687 (1984).  The

management of investments has long been held not to rise to the level of a trade or business, regardless of the extent of the investments or the time required to perform the managerial functions. See Higgins v. Commissioner, 312 U.S. 212 (1941).

Petitioner argues that I-Tech controlled the research and development of the five R&D companies and that the partnership had a "realistic prospect" of being involved in the exploitation of any discoveries. We address petitioner's arguments in turn.

A. Control

Petitioner asserts that by virtue of Mr. Slavitt's and Mr. Yaakov's "active involvement" with the five R&D companies, the limited partnership controlled the research, and as a result, establishes that the limited partnership was not a passive investor. Petitioner points to testimony by Mr. Slavitt and Mr. Yaakov regarding an initial inspection tour followed by frequent visits to Israel and numerous conversations with personnel at WorldTech,[37] RSI, and the five R&D companies. While Mr. Slavitt and Mr. Yaakov may have initially inspected the companies doing the research to determine their potential for success and communicated with people at WorldTech, RSI, and the five R&D companies on a frequent basis, we believe such activity was undertaken on behalf of I-Tech in its role as an investor in the

_____

[37]It is not clear whether Mr. Yaakov was referring to WorldTech Israel, Ltd., or its wholly owned subsidiary WorldTech U.S. Our analysis does not change in either case.

R&D companies, Mr. Slavitt's role as a promoter of I-Tech, and Mr. Yaakov's ownership interest in WTI, RSI,[38] and three R&D companies.[39]  The majority of Mr. Slavitt's and Mr. Yaakov's efforts was spent trying to assure I-Tech its stream of "royalty" income.  Such an interest in obtaining royalties is inherently an "investor-like interest", Green v. Commissioner, 83 T.C. at 688-689, and Mr. Slavitt's and Mr. Yaakov's efforts  amounted to no more than the management and protection of an investment.  The management of investments is not a trade or business irrespective of the amount of time required to perform the managerial functions.  See id. at 688.

Petitioner asserts that Mr. Slavitt and Mr. Yaakov were in charge, on a "hands on" basis, of the development of the technology.[40]  The fact that a taxpayer may have taken an active

---

[38]Mr. Yaakov had a controlling interest in RSI, WTI, and WorldTech U.S.

[39]Mr. Yaakov had a 15-percent equity interest in Cycon plus an option to acquire an additional 15 percent.  RSI, which was controlled by Mr. Yaakov, owned 30 percent of Cycon, had an option to acquire an additional 10 percent, and owned 29 percent of AiTech.  Mr. Yaakov also had an indirect interest in Oshap affiliate, Robitcad.

[40]On brief, petitioner relies on Scoggins v. Commissioner, 46 F.3d 950 (9th Cir. 1995), revg. T.C. Memo. 1991-263.  Scoggins is distinguishable from the instant case.  The partnership in Scoggins had only two partners.  The two partners invented a new type of "pancake-heated" epitaxial reactor and contributed all the technology associated with the design and production of that product to the partnership.  The partners then contracted with a corporation that they had formed and controlled to do the research necessary to develop the technology into a marketable
(continued...)

role in directing the research does not, by itself, place a taxpayer in a trade or business. See id. at 690. An entity that has no contractual control over the activities in which it invests is merely an investor and cannot be engaged in a trade or business in connection with those activities. See Diamond v. Commissioner, 930 F.2d at 376.

In the instant case, the R&D agreements did not provide I-Tech with the right to control the research and development activities of any of the R&D companies. Indeed, the original R&D agreements[41] between ATA and Efrat, which the subsequent R&D

---

[40](...continued)
product. See id. at 953. The research "was done under the guidance of * * * [the partners] with the assistance of three corporate employees." Id. Based on the particular facts in that case, the court concluded "that the partnership had a realistic prospect of subsequently entering into its own business in connection with the fruits of the research if the research was successful." Id. at 956.

In the instant case, I-Tech entered into agreements with five preexisting R&D companies organized and controlled by other parties. No one at I-Tech invented or developed any of the discovered technology, and the employees of the Israeli R&D companies, not Mr. Slavitt or Mr. Yaakov, were primarily responsible for performing the research.

[41]As noted in the findings of fact, petitioner provided only one original contract between ATA and an R&D company. The R&D agreements executed subsequently between I-Tech and the R&D companies are all similar and are based on the original agreements between ATA and the four original R&D companies (Efrat, AiTech, Hal Robotics, and Cycon). Mr. Slavitt testified, and the agreements with I-Tech confirm, that the R&D agreements were based on the original agreements with ATA. Therefore, we conclude that the right to control the research and development
(continued...)

agreements between I-Tech and the R&D companies were based on, confirm that the R&D companies had complete control over the research and development of their respective projects. I-Tech did not control the research and development of the five R&D companies.

B. Exploitation of New Products

Petitioner asserts that I-Tech anticipated exploiting any discoveries on its own and that no one else could do so. Petitioner points to a statement within the PPM indicating that the purpose of funding the R&D companies is to acquire certain technologies and to exploit those projects commercially. However, the PPM does not contain any specific plans or forecasts relating to the possibility that I-Tech might itself engage in the marketing of any discoveries, nor does the PPM mention I-Tech's plan for hiring staff experienced in the areas of marketing new technology or acquiring real or personal property. See, e.g., Harris v. Commissioner, T.C. Memo. 1990-80, affd. 16 F.3d 75 (5th Cir. 1994).

The PPM sets forth the marketing and manufacturing plans for each R&D company and describes in detail which R&D company or third party will carry out each function. The PPM fails to

_____

[41](...continued)
provided in the original agreement between Efrat and ATA is also found in the agreements with the other R&D companies.

mention I-Tech's expected or anticipated involvement in the marketing or production of any discoveries.

In Mr. Slavitt's promotional letter to potential investors, he stated that the limited partnership will provide the funding for research and development of five separate R&D projects. He further stated that when the research and development activities were completed and marketing commenced, I-Tech would receive royalties based upon gross sales and that options existed allowing the royalties to be converted into equity in the R&D companies at a later date. Mr. Slavitt's letter does not mention or even suggest that I-Tech intended to exploit any successfully developed technology on its own.

Mr. Slavitt's promotional letter, read in conjunction with the PPM, leads us to the conclusion that the plan from the beginning was for the R&D companies to exercise their buy-out options and for I-Tech to exercise its equity options in the R&D companies or their affiliates. Indeed, the buy-out options essentially guaranteed that I-Tech did not have a realistic prospect of exploiting any discoveries in its own trade or business. Since the R&D companies could exercise the buy-out options after a minimal waiting period, they would surely exercise the options if their projects were profitable enough to justify incurring the cost of manufacturing and marketing. As a result, I-Tech stood to receive production and marketing rights

only in an economically unsound venture. In the event that the R&D companies failed to commercialize the technology within 5 years from the termination of the project, the rights to the technology passed to the Israeli Government.

In the instant case, the actions of each successful R&D company provide further support for our conclusion that I-Tech had no realistic prospect of entering a "trade or business" involving new discoveries.[42] Efrat, AiTech, and Oshap all completed development of their respective technologies, and in each instance, the R&D company exercised its buy-out option and I-Tech exercised its equity options. The R&D companies that successfully developed their technologies were the ones to exploit their discoveries.

Petitioner argues that I-Tech was not legally restricted from marketing the research. Petitioner points out that four of the five R&D companies[43] had a 6-month nonexclusive option period in which to exploit the technology after it was completed. Thus,

---

[42]Although our decisions should not be based on hindsight, see <u>Diamond v. Commissioner</u>, 92 T.C. 423, 443 (1989), affd. 930 F.2d 372 (4th Cir. 1991), we may take into account a taxpayer's actions in years subsequent to the years in issue in evaluating the taxpayer's prospects during the years in issue, see <u>Levin v. Commissioner</u>, 832 F.2d 403, 406 n.3 (7th Cir. 1987), affg. 87 T.C. 698 (1986) (Tax Court was entitled to inquire whether subsequent events were consistent with its judgment of the facts available in the year in issue).

[43]Efrat, AiTech, Hal Robotics, and Cycon.

according to petitioner, I-Tech could have legally marketed products during or after the 6-month period.

The question is not whether it is possible in principle, or by further contract, to engage in a trade or business, but whether in reality, the taxpayer possessed the capability in the years before the Court to enter a new trade or business in connection with the discovery.  See Diamond v. Commissioner, 930 F.2d at 375.  The answer to the question of reality must be found in economic reality.  See id.  Economically, it was not in I-Tech's interest to market the discoveries/products on its own behalf during the 6-month nonexclusive period.  I-Tech was entitled to royalty income from each R&D company that successfully completed its research and reduced it to practice during the nonexclusive option period.  If the R&D companies were successful in exploiting their technology, they would exercise their buy-out options to acquire all rights, title, and interest in the technology at the expiration of the nonexclusive license period and continue to pay I-Tech royalty income.  I-Tech then had the right to convert its royalty interests into substantial equity interests in successful R&D companies.

Finally, the restrictions imposed by the Israeli Government seriously undermined I-Tech's ability to exploit the products in the future.  Under the terms of the Chief Scientist Agreement, only I-Tech in its independent capacity could obtain any patent

with respect to the project. However, the patent could not be exploited because know-how and the right to manufacture the product could not be transferred out of Israel without the Israeli Government's approval. Furthermore, in the event that I-Tech did not exploit the technology, the rights to such technology would pass to the Israeli Government at the end of 5 years. The PPM warned prospective investors that "there is no assurance" that the Israeli Government would grant approval to transfer know-how outside of Israel.

We are unconvinced that there was, during the years in issue, any realistic prospect that I-Tech would exploit any discoveries in a trade or business. We find that I-Tech served as a financing vehicle set up to fund five Israeli R&D companies in exchange for a stream of royalty payments convertible into equity interests in the R&D companies or their affiliates.

We hold that I-Tech is not entitled to deduct research or experimental expenses of $2,591,225, $2,834,032, and $1,497,317 under section 174 in its tax years 1984 through 1986, respectively.

II. Guaranteed Payments

Respondent determined that deductions taken as guaranteed payments of $79,867 in 1984, $179,501 in 1985, and $91,221 in 1986 were nondeductible. Petitioner did not make any argument regarding these deductions in his original brief. In

petitioner's reply brief, he argues that the challenged payments were ordinary and necessary business expenses and thus deductible.

For a guaranteed payment to be a partnership deduction, it must meet the same tests under section 162 as it would if the payment had been made to a person who is not a member of the partnership.  See sec. 707(c); sec. 1.707-1(c), Income Tax Regs. Section 162(a) generally allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  Petitioner bears the burden of establishing which fees, or portions thereof, are deductible.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).

Petitioner neither established I-Tech's entitlement to the deductions nor substantiated the amounts claimed as guaranteed payments.  We sustain respondent's determination for the years in issue and hold that I-Tech is not entitled to deduct guaranteed payments of $79,867 in 1984, $179,501 in 1985, and $91,221 in 1986.

To reflect the foregoing and the parties' concessions,

Decision will be entered

pursuant to Rule 155.